THE STATE OF IOWA v. LOUIS BUSSE, Appellant.

**Confessions.** Where a confession is offered in evidence, the accused is entitled to have his entire statement produced before the jury.

**Intoxication as a defense: INSTRUCTIONS.** The mere fact that defendant drank liquor shortly previous to the commission of the crime charged, was not such evidence of intoxication as to require its effect upon his mental condition to be submitted to the jury.

**Misconduct:** ARGUMENT. On a prosecution for murder, it was not
3  misconduct for the state's counsel to relate in argument an in-
stance where a minister killed his wife where in response to
argument of defendant's counsel that accused was a member
of the church, or to illustrate the slight motive sometimes
impelling crime, or to comment on the depravity of the mur-
derer; but the relation of an instance in which a member of
the panel which acquitted a defendant took part in afterward
lynching him, while not reversible error, was improper.

**Murder:** MANSLAUGHTER: INSTRUCTIONS. On a prosecution for
4  murder, the instructions of the trial court in relation to murder
and manslaughter are reviewed and sustained by operation of
the statute, the court being equally divided, over the objection
that the same set forth simply the general and abstract propo-
sitions of law, without making a specific application of the law
relating to manslaughter to the proven facts.
Opinions by Justices Sherwin and Ladd.

*Appeal from Bremer District Court.*—HON. C. H. KELLEY,
Judge.

WEDNESDAY, JULY 13, 1904.*

THE defendant was convicted of murder in the first de-
gree, and sentenced to be hanged. He appeals.—*Affirmed.*

*W. S. Montgomery* and *Gibson & Dawson,* for appellant.

*Chas. W. Mullan,* Attorney-General, *Chas. A. Van
Vleck,* Assistant Attorney-General, *C. G. Burling,* and *J. H.
Scales,* for the State.

SHERWIN, J.—The defendant and Lena Cassman were
married in the latter part of the year 1900, he at the time
being a widower with two small children. After their mar-
riage they lived on a farm in Butler county, Iowa, where he
killed her on the 18th day of June, 1901. Their married
life, though short, had not been an altogether happy one, for
they were both of hasty temper, and frequently quarreled over

* This and following eleven cases are published out of chronological order
because delayed by applications for rehearing.

unimportant matters, and in some of their quarrels the defendant assaulted his wife. On the day of the wife's death the family consisted of the husband and wife, three small children, and Henry Schneider, a young man about seventeen years old, who had lived with the defendant for several years. They had dinner at about twelve o'clock and immediately thereafter the defendant, Schneider, and the two oldest children went to the barn, where they had been but a short time when the defendant directed Schneider to take the two children and the gun and go out to the road and shoot robins. Schneider went as directed, taking the children with him. He walked slowly west on the road a quarter of a mile, and then started back. When he had gone a short distance, he heard two loud screams near the barn, and looking in that direction, he saw the defendant and his wife standing close together between the house and the barn. He paid no further attention to them, but continued on his way back, and when he reached the barn the defendant was there alone, and Schneider says that he then noticed a " big spot of blood on his shirt sleeve." Shortly after this the defendant sent Schneider to a neighbor's a half mile distant, and upon his return the two worked together around the barnyard for perhaps an hour, when Schneider was again sent away with the children and the gun. Before his return from this last trip the defendant joined him in the field, where they spent a little time together, and then started back towards the buildings. Soon thereafter they saw Frank Busse, a brother of the defendant, who lived a mile away, come out of the defendant's house with Mrs. Busse's child in his arms, and he hallooed to them that the house was on fire. When they reached the kitchen, they found the dead body of Mrs. Busse lying near the middle of the room, covered with feathers, and horribly burned. On the right side of the neck, extending from back of the ear down under the right lower jaw to about the median line, there was a superficial gash which exposed the coratid artery. The autopsy disclosed that the left molar

bone was broken from the frontal bone and from the superior maxillary. The zigomatic extension where it connects with the temporal bone was broken off. The mastoid process was crushed in, and the point broken off, and the temporal bone loosened. The testimony showed that the gash on the throat could not have produced death otherwise than by excessive hemorrhage, and that was not proven. The injury to the mastoid process might alone have been fatal, while the other injuries to the head were not of so serious a nature. Whether all of these injuries might have been produced by one blow would probably depend somewhat upon the kind of instrument used, and the evidence is in some conflict as to whether they could have been so inflicted, though the weight thereof may perhaps be said to show that they could not.

After the defendant had been charged with the murder of his wife, and while he was confined in jail, he made a confession to the sheriff of the county, in the presence of others, in which he stated that after Schneider and the children had gone down the road to shoot robins, his wife went out to the barn, where he was, and began to find fault with his relatives; that he finally asked her, " What is the matter with you anyway?" and at the same time reached for a pail of feed, as if he were going to throw it at her; that she thereupon screamed and ran to the house; that he followed her there, opened the door, and that, as he stepped inside she struck him with a chair over the head; that he then " went wild, caught the chair away from her, or another chair, and struck her over the head." He stated also that he poured kerosene oil over her body and set it afire; that he cut her throat with his jackknife; and that he " did the whole thing." This confession was reduced to writing by one of the persons present, and when completed it was read to the defendant and was signed and sworn to by him. Upon the trial the writing was not offered in evidence, nor was there any reason given for not offering it. The State was permitted, how-

ever, to prove the statement of the defendant by parol testimony. No objection was made to the testimony on this ground, nor was there any objection to it on the ground that the whole of the confession was not given to the jury.

It is a fundamental rule that the defendant is entitled to have " all he said on the one occasion, the exculpatory with the inculpatory statements, produced before the jury." 1 Bishop on Criminal Procedure, section 1241.

**1. CONFESSIONS.** Indeed, this rule is not questioned by the State. It is contended by the appellant, however, that it devolves upon the State to produce the whole confession, and that a part thereof cannot be received. As we have already seen, this question is not in the case, but, if it were, we should hold that the record clearly shows the whole confession to have been produced before the jury by the State, which we may say, without definitely deciding the question, we consider the better rule. Neither should we, in the condition of the record, pronounce definitely upon the admissibility of parol evidence of a confession when it is shown to have been reduced to writing, and to have been signed by the defendant, and when the absence of the writing is not accounted for. But the general rule seems to be that parol testimony is not competent in such circumstances. 1 Bishop on Criminal Procedure, section 1260; 1 Greenleaf on Evidence, section 227; 1 Wharton on Criminal Law, section 697. We have held that, where dying declarations are reduced to writing, and signed by the deceased, the writing is the best and only evidence, if in existence, and otherwise admissible. *State v. Sullivan,* 51 Iowa, 142; *State v. Fraunburg,* 40 Iowa, 555; *State v. Tweedy,* 11 Iowa, 350. And we know of no sound reason why the same rule should not be applied to confessions. This question is not in the case, however, and we need not further notice it. The suggestions are given merely for the guidance of the State upon a retrial.

The witness Schneider testified that on the day of the murder, and shortly before noon, the defendant took four

drinks of some kind of liquor; two of them from an ordinary

2. INTOXICATION small whisky glass, and, the other two from a
AS A DEFENSE:
instructions. bottle about the size of a beer bottle. This

liquor was given to the defendant by a traveling liquor sales-
man out near the barn, and the drinks were taken not far
apart, and not more than an hour and a half or two hours
before Mrs. Busse was killed. There was no evidence as
to the kind or amount of liquor drank further than we have
stated, nor was there evidence tending to show the intoxica-
tion of the defendant. The defendant asked the following
instruction, which the court refused to give, and no instruc-
tion was given on the subject of intoxication:

You are instructed that, before the jury can find the
defendant guilty of murder in the first degree, they must
ascertain as a matter of fact that the accused was in such a
state of mind as to do the act of killing willfully, deliberately,
premeditately, and with malice aforethought; and any fact
that will shed light upon the condition of his mind at the
time of the killing may be looked into by them, and constitute
legitimate proof for their consideration. And among other
facts, any state of drunkenness being proven, it is a legiti-
mate subject of inquiry as to what influence such intoxica-
tion might have had upon the mind of the defendant in the
perpetration of the deed, and whether he was not, at the time
of the killing, in such a state of mind, by reason of intoxica-
tion, as would be unfavorable to the commission of a crime
requiring deliberation and premeditation.

If there had been affirmative evidence of intoxication,
the instruction asked, or a similar one, should have been given.
The crime charged involved the condition of the defendant's
mind at the time of the killing, and evidence of intoxication
could be considered by the jury in determining his mental
condition; but we know of no authority holding that the mere
fact that an offender drank liquor shortly before committing
the crime will constitute such evidence of intoxication as to
require the question of its effect upon his mental condition
to be submitted to the jury. It is the mental confusion pro-

duced by liquor which is receivable on the question of intent or premeditation, and not the fact that liquor having been taken; for it is a matter of common observation that one man may drink a considerable quantity of liquor without being affected thereby mentally or physically, while another may be seriously affected by a small drink. 1 Wharton on Criminal Law, section 41.

In the closing argument for the State, counsel called the jury's attention to the facts developed upon the trial of murder cases elsewhere. He related a case where a minister had brutally murdered his wife. This was apparently in answer to the argument of the appellant's counsel that because the appellant was a member of the church he could not be guilty. Again, he related the circumstance of the murder of one friend by another for the purpose of securing a pair of shoes, and commented upon the depravity of the murderer. We see nothing in the argument relating to these two cases calling for censure even. The comments thereon were legitimate, in the first case in answer to the argument of opposing counsel, and in the second case for the purpose of illustrating the slight motives which sometimes induce murder.

3. MISCONDUCT: argument.

The third statement complained of presents a question of a much more serious nature. Counsel told of a case in the State of Illinois where one juror of the panel which acquitted the defendant afterwards took part in lynching him. True, counsel did not say in so many words that the accused was lynched after acquittal, but the veil covering the allusion thereto was so transparent that it hid nothing. In justice to counsel, however, we should further say that his comments on the verdict related only to the failure of the jurors to do their duty, regardless of everything else. We do not think counsel intended to impress upon the jurors the possibility of a lynching in case they should acquit, but enough was said to suggest to them that an acquittal might create such a feeling of condemnation in the public mind

as to produce a like result. What its influence upon the jury might have been we cannot say, but it needs no argument or citation of authority to show that jurors should not consider such matters, or that the prosecution should never, directly or indirectly, suggest the thought to them; and this is especially true in cases calculated to arouse public excitement and indignation. While we would not consider it necessary to reverse this case on account thereof, we see no justification or excuse for the statement, and cannot refrain from this criticism of it.

In the absence of the confession, the State must have relied upon circumstantial evidence to secure a conviction. When Schneider heard the screams, and, looking, saw the defendant and his wife standing together in the yard, he saw no violence offered the wife by the defendant, and until the confession was made there was no direct evidence of what occurred in the house when Mrs. Busse was killed. In his confession the defendant stated that she struck or struck at him as he entered the door of the house, and that he then "went wild," and struck her with a chair. If the jury found this exculpatory statement true, there would have been ground for finding the defendant guilty of a lesser crime than murder in the first degree. The defendant asked the court to instruct specifically on this branch of the case, applying the law to the facts before the jury; but the instruction was not given, nor was any given specifically calling the jury's attention to the transaction as related by the defendant. The court gave only the naked legal definitions of the two degrees of murder and of manslaughter. The instructions given announced correct rules of law without doubt, but something more than this is often necessary to insure a perfect understanding of the legal effect of proven facts. If the defendant, in the heat of passion, provoked by his wife's act, and without deliberation or premeditation, struck her a blow which was fatal, he was wrongly convicted of murder

4. MURDER: manslaughter; instructions.

in the first degree. The evidence tended very strongly to prove that death was caused by the blow or blows on the head; and, while the jury may not have found the exculpatory part of the confession true, the confession, considered as a whole, the nature of the case, and its importance as well to the State as to the defendant, demanded that the court apply the law to the exculpatory part of the confession, instead of leaving the application thereof to the jury without further light than was given in the naked legal propositions. There was evidence, it is true, tending to prove all of the elements of murder in the first degree; but it was not so overwhelming as to preclude any other finding. The facts presented to the jury were peculiarly revolting. The brutal mutilation of the body, and the other conditions present when it was found, were well calculated to arouse the passion and prejudice of any man with human instincts; and still these conditions were not absolutely inconsistent with the theory of the defense that Mrs. Busse was killed by a blow on the head, delivered in the heat of passion, and under the circumstances stated in the defendant's confession. It was the defendant's right to have this defense plainly defined in the instructions to the jury, and this we are constrained to hold was not done. The court, in its charge, gave the usual definition of manslaughter, and in another instruction said:

If you do not find the defendant guilty of murder in either the first or second degree, but do find from the evidence introduced upon the trial, under these instructions, beyond a reasonable doubt, that the defendant, in Butler county, Iowa, on or about June 18, 1901, did unlawfully kill Lena Busse, without malice either express or implied, and without deliberation, by resorting to any or all of the methods alleged in the indictment, then you ought to find the defendant guilty of manslaughter, whether such killing was voluntary or involuntary. Otherwise you should not so find.

In Bishop's New Criminal Procedure, section 878, the learned author says:

· The law of the case which the judge is to lay down to the jury is not the abstract law, such as a statute or common-law definition of a crime, but the law's conclusion from the several, and perhaps varied facts which the evidence tends to establish, viewed in connection with the pleadings. Therefore no abstract proposition, however correct, should be given in charge; not only because it would be confusing to the jury, who, being unused to legal disquisitions, would not know how to apply it, but also because its combination with the special facts might render it erroneous.

In *State v. Glynden,* 51 Iowa, 463, it was said of the instructions:

They are rather general and abstract propositions of law, correct enough in the main, but, on account of their generality, their bearing and force may not have been fully understood and correctly applied by the jury. In this respect the instructions are capable of great improvement. These remarks are made, not because we think the instructions are absolutely erroneous, but because we believe justice would be more surely administered were instructions given to juries of the character we have indicated they should possess.

If the jury did not fully understand, from the instructions given, the relations which the exculpatory facts contained in the confession bore to the degree of the crime charged in the indictment, the defendant's legal rights were not properly guarded, and the verdict should not stand. *State v. Helvin,* 65 Iowa, 289; *State v. Hathaway,* 100 Iowa, 225. And such is the conclusion of some members of the court. It is said that the instruction asked on this branch of the case was not in all particulars correct, and this may be conceded. It was a request, however, for the court to instruct specifically on that subject, and this, we think, he should have done when his attention was called to the matter, whether the instruction presenting the request was in all respects right or otherwise.

The court is not bound to instruct in the language of counsel, and in fact we have held that it is the better prac-

tice for the Judge to embody the request in its own charge.
*State v. Collins,* 20 Iowa, 90. But, although united on all
other questions discussed herein, the court is equally di-
vided on the last proposition, the views of the other mem-
bers thereof being expressed by Mr. Justice Ladd, and the
case will therefore be affirmed by virtue of the statute.—
— *Affirmed.*

LADD, J. (concurring). It may be conceded that, as
a rule, instructions should apply the law to the facts, but
in no case to be found in the books has failure to do so,
where the facts are so simple that the applicability of the
law as stated is manifest, or so apparent that misapprehen-
sion or mistake is altogether unlikely, been regarded as re-
versible error. This is for the very good reason that some
things are so plain that any elaboration or explanation is
not only unnecessary, but often tends to confusion. Of this
the case at bar is an illustration. The most serious error
complained of is the court's omission to instruct more spe-
cifically on the crime of manslaughter. An accurate instruc-
tion on the subject was not requested, and therefore the
fault, if any, must be found in the charge of the court as
given. The accused, if guilty at all, was guilty of murder
in the first or second degree or of manslaughter, and, in my
opinion, these were so clearly differentiated in the charge
of the court, the one from the other, the duty of deciding
of which he was guilty so strongly emphasized, and the
definition of manslaughter, as given, so pertinent to the only
state of facts indicating in any way guilt of that offense,
that the jury could not have failed to fully comprehend the
bearing of the law on the facts of the case.

I. In the fourth paragraph of the charge the court in-
structed that, " whosoever kills a human being with malice
aforethought, either express or implied, is guilty of mur-
der," and in the seventh that manslaughter is " the unlaw-
ful killing of a human being without malice, either express

or implied, and without deliberation or excuse." In the intervening instructions the distinction between murder in the first and second degree was stated, and accurate definitions of " malice," " malice aforethought," " deliberate," " premeditate," and " willful " were given. The jury then, at the outset, was made to understand that, in order to convict of murder, an affirmative finding of malice was essential, and, if of murder in the first degree, to malice aforethought must be added the premeditated and deliberate purpose to kill, and that, with all the above elements eliminated, the crime would be manslaughter only.

II. The necessity of discriminating between offenses, and deciding of which he should be convicted, was definitely stated. In the second instruction it was said he could be found guilty of any one of them, while in the fourth the jury was told that, if he " should be found guilty of one of them, and a reasonable doubt was entertained as to whether he was guilty of a greater or less offense," he should be given the benefit of the doubt, and be convicted of the lesser one only; and the twenty-sixth instruction cautioned against a conviction of more than one of the crimes enumerated. Precisely what was essential to a verdict of guilty of each was concisely stated in three successive instructions: In the twenty-third, what was essential in order to convict of murder in the first degree; in the twenty-fourth, what should be found to convict of murder in the second degree; and in the twenty-fifth instruction that, if the killing was unlawful, and without malice, either express or implied, and without deliberation, he should be convicted of manslaughter.

III. With full knowledge of the distinction between murder and manslaughter, and conscious of their duty, as they must have been, to determine of which the defendant was guilty, the jurors began their inquiry.. The evidence was without serious conflict. None was introduced in behalf of the defendant save as to his previous character, his offer to loan some money belonging to his wife, and a contradic-

tory statement of a witness outside of court. Aside from
his admissions, it was purely circumstantial. But for these,
the manner of his wife's death could only be inferred from
the bruises and wounds on her dead body, furnishing no
indication of the mode and intention of the perpetrator of
the crime. The weapon was unknown. Even in his alleged
confession the accused was not sure that the fatal blow was
given with a chair. Aside from some admissions warranting
the bare inference that he may have caused her death, the
only particulars to be found in the record are those in the
sheriff's testimony of the statement made by the defendant
when in jail:

While I was choring around out at the barn, my wife
came out, and she went talking about her folks — finding
fault. That there was Harm Cassman. She wasn't going
over there any more. He charged her five dollars for riding
with him over to Ackley to Kruse's — Siko Kruses — because
he had some of her furniture he would not let her have. Then
I said to her, " What is the matter with you anyway ? " There
was a pail of feed sitting on the ground. I reached down
and took it, as though I was going to throw it at her. She
screamed, and ran to the house. I followed her up to the
house, to see what she was going to do, and as I opened the
door she struck me over the head with something. I went
crazy wild at that time, and struck her with something, I
don't know what. I done all the rest.

He was pretty sure it was a chair with which she hit
him, and that he seized the same from her, or another one,
and struck her. The consequence of an act, naturally
resulting therefrom, in the absence of any circumstances
indicating the contrary, are presumed to have been
intended, as the jury was informed; and but for the con-
fession, a verdict for murder in either the first or second
degree must have been returned. This is conceded, but
it is said that the attention of the jury was not directed to
the bearing of the confession on the crime of manslaughter.
Let me repeat that the only information as to the manner

of killing was that contained in the confession, and it was
the only evidence even tending to reduce the crime to that
of manslaughter. Was it possible for the jurors to forget
it? Other incidents of the trial may have been overlooked,
but the account said to have been given by the accused him-
self could not have been ignored. Even were this possible,
it may safely be assumed that the able counsel for the de-
fense, whose efforts throughout the trial were directed more
to reducing the degree of the offense than in procuring an
acquittal, did not permit the significance of this evidence to
escape attention. But the jury was not left in the dark.
The necessity of deciding whether defendant was guilty of
manslaughter had been strongly impressed upon their minds
by the charge of the court, and they were told in the twelfth
instruction that, " to constitute voluntary manslaughter, the
killing must be done when the reason is disturbed or ob-
scured by passion to an extent which causes a person to act
rashly, without reflection, and from passion, rather than
judgment. There must be an adequate provocation for the
passion, and the killing must be done without previous mal-
ice." The only evidence to which, by any possibility, this
instruction could have been construed to refer, or, on the
other hand, which could have been connected with this in-
struction, was that of the confession. The accused had said
he went " crazy wild " when his wife hit him as the door
was opened, and as a result he struck her, presumably, the
fatal blow. The only inference to be drawn from this lan-
guage was that he lost his temper, and killed her in the heat
of passion, and we submit that this was the only inference
the jurors could have drawn. With this instruction before
them, saying that, " to constitute voluntary manslaughter,
the killing must be done when the reason is disturbed or
obscured by passion to any extent which causes a person to
act rashly without reflection and from passion rather than
judgment," is it possible that they were unable or failed to
make the application? Could a direct instruction includ-

ing the language of the confession have made it plainer?
Certainly not, and a ruling to the contrary belittles the in-
telligence of the jury.

It must not be forgotten that the courts, in delivering
instructions in this State, are speaking to men of larger ca-
pacity and more liberal education than was possessed by
those who sat in the jury box when many of the rules relating
to the charging of juries were developed and announced.
By this I do not mean to say that inaccuracy in the state-
ment of the law of a case should be tolerated, but that in
determining whether the jury must have comprehended and
correctly applied the law to the facts the high degree of
intelligence and advanced education of the modern juror
should be recognized, and taken into consideration. This
was not necessary, however, in the instant case, for any-
thing above ordinary mental acumen need not be presumed
in order to conclude that the applicability of the law to the
statement contained in the confession was fully appreciated
by the jury; for (1) the account contained in such confes-
sion was the only evidence to which the instruction on man-
slaughter could have been applied; (2) the instruction was
pertinent to the language of the confession, and directly
applicable thereto, and to no other evidence in the case;
and (3) the necessity of a finding as to whether defendant
was guilty of this particular offense was especially enjoined
upon the jury. In convicting him of murder in the first
degree, the contention that he acted without malice was re-
jected. The finding of deliberation, premeditation, and a
willful purpose to kill necessarily excluded the notion that
the crime was the result of passion. His own story stamped
him as the aggressor. If he is to be believed, he committed
the first assault by reaching for the pail of feed in such a
threatening manner that his wife rushed screaming to the
house, and closed the door behind her, the defendant pur-
suing, and upon opening the door was met by force in appar-
ent self-defense, when he beat her down to the earth. It

may be that his wife acted with provocation, but certainly this ought not to be said of him. He was following up a fierce and unprovoked assault, and a finding by a jury that his passion, if any he had, when he struck her down while repelling his pursuit, should be attributed to any " adequate provocation " on her part would be entitled to little respect, indeed. His previous ill feeling toward deceased was shown, and the verdict, in fixing the death penalty, was warranted by the record, if in any case life ought to be forfeited as a penalty for crime. These matters are mentioned because they obviate any inference which might possibly be drawn from the verdict that the jury, because of its character, may have failed to appreciate the bearing of the law and the evidence on the issue as to whether defendant was guilty of manslaughter.

In my opinion, the accused was accorded a fair and impartial trial, and the judgment ought to be *affirmed*.