STATE OF IOWA, Appellee, v. GLENN WILSON, Appellant.

No. 46278.

NOVEMBER 17, 1943.

H. S. Life and McCoy & McCoy, all of Oskaloosa, and Frank R. Talbott, of Brooklyn, for appellant.

John M. Rankin, Attorney General, Don Hise, Assistant Attorney General, and L. R. Carson, County Attorney, for appellee.

BLISS, J.—██ On October 19, 1942, an indictment was filed charging the defendant and his two brothers, Albert and Clarence Wilson, with the crime of murder, in that on June 15, 1942, they did willfully, deliberately, feloniously, and with premeditation and malice aforethought, and specific intent, kill one Harry Bolden. The defendants were granted separate trials and the State elected to try this defendant first. On November 16, 1942, he waived arraignment and entered a plea of not guilty. On that date he filed a motion for continuance because of the absence of a witness, Dr. Boortz. The motion was denied. The error assigned upon this ruling will be referred to later. After preliminary motions and demurrer the trial was begun on November 23, 1942, and the verdict was returned on December 2, 1942. In support of his plea of not guilty the defendant urged that the killing was done in self-defense in an affray in which Bolden was the aggressor, and that, because thereof and because of the defendant's mental condition and intoxication, there was no premeditation, deliberation, or malice aforethought, and no specific intent to kill.

Numerous errors have been assigned by the appellant. Before specific discussion of any of them we will make reference to the general fact situation.

Many of the facts are not in controversy. At the time of the trial the appellant was thirty-eight years old, married, and lived with his family in Oskaloosa. He had played some professional baseball, but his regular work for many years had been in connection with various railroad companies. Nothing derogatory to him appears in the record other than the charge under consideration. He had been working in the shipyards at Cleveland since early April 1942, and had returned to Oskaloosa on Saturday, June 13, 1942, for the purpose of enlisting in the United States Army. He had done some drinking Saturday. His brothers (codefendants) had returned to Oskaloosa that same week end. Their mother lived there. Monday afternoon (June 15, 1942), after getting a haircut, and after drinking some beer in two or three taverns, he went to the liquor store and bought two quarts and three pints of whisky. His brother Clarence, commonly called Dick, then took the appellant, and the whisky, and three or four others, including one Andrew Jackson Rogers, to the latter's home. This was about mid-afternoon. Rogers is a colored gentleman, a bachelor, who lived in a small two-room dwelling, about twenty by twelve feet, out near the city limits. He is most often referred to in the record as "Punk Wing." In the party were the appellant and his two brothers, Clyde Ballinger, Paul McFarland, and Rogers. All were white men but Rogers. They spent the time drinking beer and whisky, visiting, and arguing. The appellant left shortly after he came, to take two children home who had ridden to the place with him. He returned in a short time. Clarence Wilson was gone for an hour or more but returned about 8:15 p. m. At that time he testified the appellant and his brother Albert were asleep at the table with their heads on their arms. Others of the party left and returned during the afternoon. Shortly after 8:15 p. m. Harry Bolden, a colored man, came in. He had been drinking some beer that afternoon, but had the evening meal at home and left his brother's house about 7:30 p. m. He and his wife had come to Oskaloosa from Flint, Michi-

gan, about eight or ten years before. He had at one time done some prize fighting. There was testimony that he had a quarrelsome, pugnacious disposition. Some of this testimony was with respect to specific instances which had either been observed by the appellant or had come to his knowledge. Three witnesses testified that he had a general reputation in the community of being a quarrelsome and violent person. Two witnesses testified that his general reputation as to being a peaceable and law-abiding citizen was good.

When Bolden dropped in on the party at the Rogers home late that evening he saw a bottle of whisky on the table and asked Rogers for a drink. He was told that the whisky belonged to the appellant, and the latter told him to help himself. He poured himself about a two- or three-ounce drink in a jelly glass. Later he and the appellant each took two more drinks out of the same glass. Someone testified that these drinks were pretty good "shots." The group continued to argue rather noisily about baseball, horse racing, prize fighting, etc. There was testimony that Bolden told Ballinger he owed him a good beating, for some slight to Bolden's children; that he told about whipping the Dave Brown family; that he boasted that he could whip any man in the room, and that no one took issue with him on the point. While the appellant did not so testify, the State introduced in evidence a statement signed by him on June 16, 1942, stating that Bolden had argued with him about something, the nature of which he had forgotten, and told him how tough he (Bolden) was, and threatened to stick a penknife in him. It is not disputed that about this time the appellant said to his brother Al, "What do you say, let's go home," and Al said, "Come on," and both of them left the building, and were followed by Bolden and a little later by Rogers and Clarence Wilson. The latter is badly afflicted with arthritis and much of the time is compelled to use crutches, although he did not have them that night. He drew a pension from the United States Government for being totally disabled.

Albert Wilson had his automobile parked in the yard by the woodshed, about twenty-five feet from the Rogers house. The appellant testified that Albert went ahead of him along the path toward the automobile, and he was walking along when

Bolden ran up behind him and grabbed him around the neck and threw him to the ground, and while both were struggling, Albert came back and got down over them and said: "Cut it out, you guys; what is the matter?" Al then got Bolden loose and he and the appellant got up, and Al put his arm over Bolden's shoulder and they walked over back of the automobile. The appellant and Clarence and Rogers then walked to the front end of the automobile. Clarence and Albert corroborate the testimony of the appellant as above given.

Donald Padgett, twelve years old, and his sister, Joyce, age ten, and three or four other children were playing and running about in the street in front of the Rogers home, about 9 o'clock in the evening. Lillian and Juanita Stewart were with them. They were witnesses for the State. On direct examination Donald testified he saw three white men and a colored man come out of the house and they were fighting along down in the yard, and finally all of them went down on the ground near a little tree, the colored man on his knees and the others around him, holding him. One of the white men struck at the colored man with the bottle but the colored man knocked the bottle out of his hands and Punk Wing threw it into the ditch. The men all got up then and quit fighting and walked over toward a lilac bush, and nobody was holding the colored man. On cross-examination he testified that he was not sure, that there might have been only two white men there:

"They were all on the ground fighting on their sides. Harry was fighting; he was fighting back. I saw them come out of the house; Harry came out first. There might have been one of the white boys come out of the house first ahead of Bolden. The white boy went over toward the flower bed; Harry followed him; that is where the fight started. Then the other boys came, Punk Wing was there. They were kind of scuffling around there on the ground. Then they quit and went over by the lilac bush.* * * Harry followed the white boy over to the flower bed. Q. The white boy was walking away? A. I don't know what he was doing; he was going toward out of Punk's yard."

Donald's father then called him, and the children all went to the Padgett home, about a half block away. When the men

were first on the ground he heard the colored man say, "I'll take you one at a time, but not all at once." After he went home he thought he heard about three blows struck.

Joyce Padgett testified that she saw the men come out of the house, and saw them on the ground on the colored man, but she saw no blows of any kind and heard nothing said by anyone. But she also testified that she heard three blows struck after she went home. Juanita Stewart, thirteen years old, was one of the children. She testified for the State. She saw five or six men come out of the house and two of them—a white man and a colored man—began wrestling on the ground. She had no recollection of what the other men did. She also went to the Padgett home but came back shortly afterward.

Going back to the testimony of the participants, Albert testified that they walked toward the rear of the car, and Bolden picked up a club back of the car and said something about knocking somebody's head off, and he (Albert) ran away. Clarence testified to hearing the same remark and heard some blows being struck, and then heard Bolden say to Glenn that he "would let his guts out." Glenn then bumped into Clarence and knocked him over as he was backing away from Bolden. Clarence testified that when he got up Bolden was lying on the ground, and Glenn was leaning against the car holding his right arm. Some of the other men then carried Bolden into the house. After helping Glenn into the car, Albert Wilson got in and drove to a near-by telephone, and had a call put in to the police station for a doctor and an ambulance. This call was received at the police station at 9:27 p. m. Word was at once sent to Nevins, the policeman on that beat, and to other peace officers. Nevins was the first officer to reach the Rogers dwelling. He examined the body, observed a cut on the head, felt his pulse, and stated to those present that Bolden was dead. He then went outside and asked the appellant what happened, and he replied, "We had a fight and I hit him." He said he hit him with a club. Nevins then looked around and found a bloody spot on the ground, and near by a knife, with blades closed, belonging to Bolden. Close by he found a club with blood and hairs upon it. The sheriff and his deputy arrived shortly after

Nevins did. The appellant stated to both of them that he took the club from Bolden and struck him with it. Nevins examined the appellant at this time and found bruises and abrasions upon him: a bruise on the forearm, and one on the upper arm, and one behind the ear. The sheriff testified that when he arrived he asked the appellant what happened and he answered: "I hit the son-of-a-bitch." The deputy sheriff and Dr. Boortz arrived on the scene at about 9:40 p. m. and talked with the appellant. He told them he took the club away from Bolden and struck him "because Bolden said he was going to 'let his guts out.' " The deputy sheriff and Dr. Boortz took the appellant to the jail, where they both examined him. The deputy testified:

"I noticed Glenn had an abrasion on his right upper forearm, kind of a diagonal mark there, and he had a bruise on the right shoulder, a big mark in about that position [indicating]; he had a bruise on his right shoulder and a lump behind his right ear, a bump about half the size of a walnut as near as I can describe. * * * He said that his arm hurt him."

The sheriff's wife saw him the next morning and testified:

"When I first saw him he acted sort of dazed * * * I called a doctor for him; a man nurse was brought there to attend him shortly after he came to the jail. He [the nurse] was there two nights."

Dr. Day, a physician and surgeon having over thirty years of practice in Oskaloosa, was called to the jail to treat the appellant on the morning of June 16th. As a witness for appellant he testified that he found him dazed and nervous and apparently suffering from the effects of liquor; he had a moderately large bruise between the wrist and elbow on the right forearm, with some abrasion and break of the skin; "It would be awfully hard to answer as to what could produce a bruise or abrasion of that nature, but as an opinion, it looks like it took some foreign object in the case to produce this injury to the forearm"; there was a moderately large swelling between the elbow and shoulder, as though there had been some trauma or some damage done by some extra force, that could have been done by some heavy

object, fist or boot; there was a large red bruise, with some abrasement of the skin, about the size of a hen's egg, behind the right ear, exactly over the mastoid, and extending into the hair; "I couldn't say definite just what would cause that; it would take a powerful blow to cause a swelling of that size, a real hard blow"; there was a bruise or swelling, with the skin knocked off, exactly at the angle of the left jaw; the skin was broken and bruised as if something had struck him; he dressed his injuries and gave him sedatives for his pain and recommended that a nurse attend him. This doctor called upon the appellant the following day and found him very nervous. He expressed an opinion that a blow of the severity of the one back of the ear would affect the nervous and circulatory system.

There was no dispute as to the extent or character of the injuries upon either the appellant or Bolden. The coroner examined the body at about 9:30 p. m. at the Rogers home and later that night at the undertakers'. As a witness for the State, he testified that he checked him over and found a scalp wound and not anything else; it was about four inches long and extended almost through the coverings of the skull; it was probably responsible for the death; he found no other abrasions or bruises on the head, back, or shoulders of the deceased.

"Q. Now, Doctor, in your examination at the Wilcox-Garland [Funeral] Home, you found no evidence that the deceased had been beaten with a club about the back or shoulders? Is that correct? A. That is right."

The undertaker, who undressed and bathed the body, sewed up the scalp wound, and prepared the body for burial, as a witness for appellant, said:

"Q. Now, Mr. Head, will you tell the jury the wounds, bruises or abrasions you found on that body, if any? A. I found one. Q. Where was that, Mr. Head? A. Right on the back of the head. Q. You found no other bruises, broken bones or abrasions on the body? A. I did not."

Paul McFarland was not a witness. There is no evidence that he saw any part of the affray, but came out of the house when called to help carry Bolden into the house. Clyde Bal-

linger did not see any part of the fight or what took place outside, but was one of those in the house. Testifying for appellant, he said that he observed Bolden take two pretty good-sized drinks of whisky, around two ounces or better; he observed his attitude; he was quarrelsome; Bolden said he was going to whip him; he claimed he was a prize fighter, and that he could whip any man in the house; Bolden was not anybody's friend if you crossed him a little bit; he always had a chip on his shoulder to have somebody try to knock it off; Glenn Wilson, Bolden, and the rest of them were all drinking; he thought he drank no heavier than the rest; he brought a pint of liquor with him; everybody took a drink whenever he wanted it; there was no fighting inside; he neither saw nor heard any quarreling or fighting between Bolden and Glenn or Al; ''Well, everybody was talking one thing, then another; some were racing horses, some playing ball, some footracing; some of them were railroading; everybody, I guess, had the floor or tried to get it''; Glenn and Al left the house first to go home; Glenn said to Al, ''Come on, let's go home''; Bolden followed them out; he got up over Punk's knees and feet and also up over Ballinger's and followed them out of doors.

On the morning of June 16th, at the jail, a special state agent and a number of local peace officers questioned appellant, and a typewritten memorandum of his answers was prepared by the state agent. The statement was received in evidence without objection by the defense. The statements therein are not inconsistent with his prior admissions or his subsequent testimony, although appellant said he had little memory of its contents. The agent, testifying for the State, said:

''He told me that Harry Bolden had an open knife and threatened to cut him; also that Bolden struck him over the shoulder and behind the left ear with a club and that he took the club away from Bolden and struck him in the head.''

The statement recites, in substance, what we have set out about his drinking on Saturday and Monday, and of the gathering at the Rogers home, and of his drinking with Bolden. Of the afternoon's drinking, the writing states, ''during the meantime

we drank about two quarts of the whiskey." After stating that he had some argument with Bolden in the house, the nature of which he did not remember, the writing states:

" * * * we went outside where the argument continued and Bolden picked up a stick and hit me on the right shoulder and forearm and back of the right ear. I took the stick away from him and held it in one hand, my left hand, I am naturally left handed, and I struck him on the head with this stick. After I struck Bolden he dropped to the ground and from the fact of being struck on the head I don't remember what happened after that, but I do know that I only struck him once. * * * The next that I remember I was talking to B. L. Mapes, Deputy Sheriff."

The clerk of the court, who was called in to swear the appellant, testified that Glenn objected to signing the statement, and that as he was leaving he was called back by Glenn or someone else, and then the appellant signed and swore to the paper.

Clarence Wilson, in addition to his testimony already noted, testified that Glenn and Albert went out of the house saying they were going home, and Bolden followed them out, and when he and Rogers came out Al was kneeling over Glenn and Bolden on the ground and telling them to not be making a scene and trying to separate them. He also testified that in the afternoon and evening at the Rogers home there was considerable drinking and that the appellant and Bolden were under the influence of liquor.

The appellant testified that after the scuffle on the ground was over he went over to the car to get in, and he heard Bolden say that he would knock his G-d d----d head off, or words of that import; "there wasn't much I could do; he started pounding me and I finally got hold of the club and got it away from him; then he said, 'I will let your guts out,' and I backed up, started to run backwards and run into Dick trying to get away, and Bolden followed me, crouching and making motions. I kept backing up on the east side of the car, and he kept making motions and finally he lunged too close to me and I swung the club and hit him. * * * I knew my life was in danger. * * *

After I wrenched the club from Bolden's hands, when he came at me in this crouch, he had a knife in his hand."

Rogers was a witness before the grand jury, but the State did not call him as a witness at the trial. However, in the opening statement of the county attorney to the jury he told them what Rogers would testify to, which, in substance, was that the appellant and Al left the house to go home and in a minute or two Bolden followed them, and shortly thereafter Rogers heard a commotion and he and Clarence went out and found the appellant and Bolden and Al scuffling on the ground, and when they got up Al put his arm about Bolden's neck and they walked over back of the car in this manner, and he heard them talking in tones too low to hear clearly; but finally Bolden and Al came from back of the car, and then he heard Bolden make this statement: "Well, if that is the way it is, I will let the guts out of some of you."

We have set out above the substance of the pertinent testimony introduced by both sides, with the exception of that of four witnesses of the State. Two of these were sisters—Lillian Stewart, age fifteen years, and Juanita, age thirteen years. The third girl, Charlotte Phipps, was thirteen years old. The fourth witness, Golda Morgan, was a woman who lived across the street from Rogers. Lillian testified that she and Charlotte came together from the grocery store some time after 8:30 p. m., and found the Padgett children and Juanita playing in the street in front of the Rogers house. She testified that she did not see the men come out of the house; and apparently she did not see the men scuffling and wrestling on the ground, as she testifies to none of the matters testified to by Donald or Joyce Padgett, although she was with them when their father called them, and she and Charlotte and Juanita went with them to the Padgett home. She also testified:

"Charlotte Phipps was with me; we were returning from Black's Grocery; it is east of Punk's home; as we approached his home there was a noise over there; there was a man on the ground and three other men around him; one was a colored man * * * Q. Tell the jury just what you saw and what you heard. A. Well, at first we saw these men standing there and then

we saw some man had a club in his hand, he was striking at this man with his club; we heard this man say, 'He asked for it and he was going to get it.' And then someone said, 'If anyone interferes they will get the same thing.' A white man had the club. I don't know who he was. Q. At the time the white man said, 'You asked for it and are going to get it,' where was he? ["He" refers to Bolden, according to the transcript.] A. Right near that lilac bush. Q. Was he standing? A. No, he was on the ground. Q. Where were the other white men? A. They were near him, one on each side of him. Q. Were they on the ground also? A. It looked like they were on their knees. Q. Then just tell what you saw, what the white man did with the club then. A. I didn't see that; I went on up to Padgett's; then later we came back, in about five minutes. Juanita, Joyce, Donnie and Tom Padgett were with me when I came back. After we came back there that night all we saw then was the cops."

On cross-examination she confirmed her direct examination:

"Q. You think that one or two of the white men were down on the ground? A. Two. Q. You are certain of that? A. Yes, sir. * * * I know where Golda Morgan lives south of where Punk Wing lives. Q. You saw her there? A. No, she wasn't there. I didn't even see her out in her own yard. The only thing I saw was these men over by the lilac bush."

The Padgett children, who were with Lillian at all times, do not testify to seeing any blows struck by a club. Joyce Padgett also testified that Golda Morgan was not there.

Juanita testified that she went to the Padgett home with the other children, which took them two or three minutes, and after staying there a few minutes, and being gone five or ten minutes or a little more, she came back down to Punk's *alone;* she saw seven persons in his yard, three by the corner of the house and four over by the lilac bush, one of whom, Bolden, was on the ground. One white man was beating him with a club, and two white men were on him; "I heard Harry say for Punk to take them off and Punk said, 'he was afraid he would get his head knocked off if he went up there.' I heard the white man

with the club say, 'you asked for it and you'll get it.' Harry said he wanted to see his wife and kids, and that he could take them one at a time but not all three of them.'' She testified that she saw the white men strike Bolden over the head and body. about twenty times, ''awful hard''; that Golda Morgan came out, after she came down the second time, and stayed about half an hour, and ''this fighting was going on all of that time.''

''Q. Didn't you, in the presence of your mother * * * tell Mr. McCoy and I you went up to the Padgett home but you didn't come back? A. Yes, sir. Q. Now, Juanita, when Mr. McCoy and I talked to you in your home, in the presence of your mother and in the presence of your aunt, last summer shortly after this case came up, didn't you intend to tell us the truth then? A. *Half*. Q. Half the truth; you told us then you would tell us the truth, didn't you? A. Yes, sir. Q. We asked you to tell the whole truth, didn't we? A. Yes, sir. Q. And you told us then you were telling the truth, didn't you? A. Yes, sir. Q. But you didn't do it, did you, Juanita? A. No, sir.''

Charlotte Phipps testified that she and Lillian came to the Rogers home around 8 or 9 o'clock in the evening and heard some pounding and a dog barking:

''We saw a man lying on the ground * * * and someone else standing up over him; he had a club and was hitting something on the ground; there was another man over by the car, he was holding his wrist; and looked like he saw something on the ground, and I think another man standing by the back rear fender of the car. * * * When I got closer I could see that this man was pounding a colored man on the ground. I learned it was Harry Bolden. I didn't know who the white man was. There were three white men there. * * * I think that the man that was pounding said, 'I will kill you, you son-of-a-bitch, you asked for it.' I didn't hear the colored man on the ground say anything. I didn't hear anything else. I then walked on up to Padgett's. I stayed there a few moments and then came back. Two men were carrying the colored man in the house.''

On cross-examination, she testified:

"The man I saw using the club was hitting the man many times. He hit him with the club and kept on hitting, just like he was chopping wood or something. He was already doing it when I got there. He was still at it when I left. I stayed there for several minutes. The man that was holding his wrist was over by the car, over by the coal shed, almost over to the house. He wasn't where the negro was. The other white man was standing over by the fender on the west side of the car, the other side of the automobile. He wasn't doing anything. There was only one white man near the negro. I didn't hear the negro say anything. While I saw this white man striking this negro, Donald Padgett was there with me. I did not see Golda Morgan there at that time."

Donald Padgett gave no testimony that he saw anyone strike Bolden with a club. Neither did his sister. Both testified that they heard perhaps three blows struck after they went home and later they saw Bolden being carried into the house. The blows which they heard struck might have been blows which left the bruises on the appellant's arm, shoulder, and head.

Golda Morgan testified that when she "first saw the three white men and the colored man they were fighting; there was two holding this colored man. *He was not down on the ground.* His back was toward our house. There was one in front of him and two behind him. The man with the club was standing behind him. I heard the colored man say, 'two of you hold me while the third one beats me.' The man with the club was beating him, on the left shoulder. The other two men continued to keep hold of him. I didn't count the number of times that he hit him. * * * I expect I was there maybe six or seven minutes, something like that. Q. And during that time they were beating him all the time you were there? A. Why, sure. Q. Is that right? A. Yes, sir. They were beating him on his left shoulder. That is the only place I saw them striking him. I don't think they were hitting him on the head. It was just on that left arm. I then went over and sat down on the porch. Q. *At the time you last saw them was the colored man still on his feet?* A. *Yes, sir.*"

The court submitted three offenses: murder in the first degree, murder in the second degree, and manslaughter. The appellant has assigned and argued over twenty errors. We are not passing upon errors not specifically discussed herein, because of our conclusion that the judgment must be reversed because of errors expressly passed upon herein.

I. The three following instructions were requested by the appellant. They were refused by the court, and no instruction referring to their subject matter was given by the court. They are:

"[1] You are instructed that the intoxication of the defendant, if shown, should be considered as bearing upon the question as to the degree of his offense, if any.

"[2] If you have a reasonable doubt as to whether or not the defendant was too drunk to entertain or carry malice you cannot find him guilty of murder in any degree.

"[3] It is a general rule of law that voluntary drunkenness or intoxication is no defense or excuse for crime. But when a specific intent is necessary to constitute a crime, intoxication of the alleged perpetrator may be taken into account in determining whether he was capable of entertaining such intent; that is, if you find from this evidence that, at the time of the alleged killing of deceased, the defendant was intoxicated. You are therefore instructed that if you find that defendant at the time of the alleged killing was intoxicated, and was so far intoxicated, or under the influence of intoxicating liquor, to such an extent, as to be incapable of willfulness, premeditation, or deliberation, or of having a specific intent to take the life of said Harry Bolden, if he did take his life, then and in such case you would not be justified in finding him guilty of murder in the first degree."

In answering the errors assigned because of the failure of the court to instruct upon the subject matter of the requests, or to give any of them, the appellee does not question their correctness. The State's only answer in argument is that there was no factual basis for such instruction—that it was for the court to say, as a matter of law, and not for the jury to find, as a

matter of fact, whether this defense was established. In other words, the question was, and is, whether reasonable men and women could reasonably come to but one conclusion on this matter. If they might reasonably differ, then the matter was for the jury to determine, upon proper instructions from the court as to the pertinent law.

As set out above, the party at the Rogers home had plenty of intoxicating liquor to drink. Everyone drank and as often as he wished. They drank and noisily argued and quarreled from about 3 o'clock in the afternoon until 9 o'clock that night, which was approximately when the homicide occurred. The appellant had been drinking beer before going to the Rogers house. No food is shown to have been eaten by him during the period mentioned. There is undisputed testimony that he was asleep, with his head on the table, about 8:15 o'clock. His brother Clarence testified that the appellant was "under the influence of liquor"; in other words, that he was intoxicated. The State made no attempt to rebut this testimony or to minimize the extent of the drinking. In the closing argument the prosecution referred to the parties at the Rogers home as a "bunch of fellows *at least half drunk.*" In its printed argument to this court the appellee states "that they had all been *drinking considerably.*" The deputy sheriff, who took the appellant to the jail that night, was asked, "Would you say that your prisoner on the night of June 15, 1942, when you took him to jail was in a dazed condition?" Objection to the question was sustained. "Q. Well, describe his condition. A. Well, I wouldn't know hardly how to describe his condition, Jim, he had been drinking some, but otherwise he seemed in pretty good shape." The question which was rejected referred to the appellant's mental condition. It is fair to say that the quandary indicated in his answer referred to his mental condition. When the sheriff's wife saw him the next morning "he acted sort of dazed." His condition was such that she called a doctor, and the latter put a nurse on the case. When the doctor came he testified that he found him dazed and nervous and apparently suffering from the effects of liquor. There is no direct testimony in conflict with any of the above-stated matters. Such support as there may be for any contention

that the appellant was not sufficiently intoxicated to justify the submission of this matter of defense rests upon inferences deducible from his conduct that evening. The State argues that the clarity of the testimony of the appellant and other members of the party refutes this defense. It is true that the appellant had sense enough to suggest that he should go home and to start for home. His mind was sufficient to direct his efforts in the struggle with the deceased, who had also been drinking. He remembered some matters but was not so clear as to the others. His signed statement recites that after Bolden dropped to the ground from the blow he did not remember what happened after that, and the next that he remembered was when he was talking to the deputy sheriff. And if the testimony of those witnesses that the appellant made a veritable chopping block of the deceased be accepted as a verity, it may be reasonably inferred therefrom that the appellant suddenly changed from a peaceable man to one who had lost his reason.

There is no difference of views as to the principle of law involved. Where a specific intent is the gist of a crime or an essential element thereof, it is a right of the accused to prove any pertinent facts which tend to show a lack of such intent. It is the very heart of the crime of first-degree murder that the homicide be with a specific intent to kill, after premeditation and deliberation. And if the accused be intoxicated to such an extent as to deprive him of the power to form the requisite intent he cannot be found guilty of that particular offense. Intoxication is a matter of degree. Its effect upon the mind may vary from mere mental exhilaration to mental and physical coma. To be such a defense as we are considering the intoxication must be something more than the former. The law does not specify the degree or the percentage of intoxication essential to sustain this defense but it does require that it be such as to render the accused incapable of the requisite specific intent. He may be under the influence of intoxicating liquor, but he will not be absolved of criminal responsibility if he still possesses mental capacity to entertain the intent. Mere intoxication is not sufficient. Neither is it enough that he had been drinking liquor. State v. Bennett, 128 Iowa 713, 716, 105 N. W. 324, 5

Ann. Cas. 997; State v. Desmond, 109 Iowa 72, 81, 80 N. W. 214; State v. Pasnau, 118 Iowa 501, 503, 504, 92 N. W. 682; State v. Dorland, 103 Iowa 168, 174, 177, 72 N. W. 492; State v. Maxwell, 42 Iowa 208, 212; State v. Donovan, 61 Iowa 369, 370, 371, 16 N. W. 206; State v. Sopher, 70 Iowa 494, 498, 30 N. W. 917; State v. Williams, 122 Iowa 115, 122–124, 97 N. W. 992; State v. Conners, 95 Iowa 485, 486, 64 N. W. 295; State v. Steffens, 116 Iowa 227, 230, 89 N. W. 974; State v. Wilson, 166 Iowa 309, 318–324, 327, 144 N. W. 47, 147 N. W. 739; State v. Graff, 228 Iowa 159, 174, 290 N. W. 97; State v. Bell, 29 Iowa 316; State v. Yates, 132 Iowa 475, 109 N. W. 1005; State v. Walker, 200 Iowa 341, 342, 204 N. W. 215; State v. Patton, 206 Iowa 1347, 221 N. W. 952; State v. Crietello, 197 Iowa 772, 773, 197 N. W. 902; State v. Johnson, 211 Iowa 874, 881, 234 N. W. 263; State v. Heinz, 223 Iowa 1241, 1257, 275 N. W. 10, 114 A. L. R. 959; State v. Harrison, 167 Iowa 334, 338–340, 149 N. W. 452; State v. Sparegrove, 134 Iowa 599, 602, 112 N. W. 83; State v. Martin, 125 Iowa 715, 719, 101 N. W. 637; State v. Busse, 127 Iowa 318, 322–324, 100 N. W. 536. The burden of establishing this defensive issue of intoxication is upon the defendant. It is an affirmative defense which must be established by a preponderance of the evidence. State v. Yates; State v. Sparegrove; State v. Harrison; State v. Heinz; State v. Crietello; State v. Patton; State v. Walker; all supra.

Not only is this defensive issue admissible in a trial for murder in the first degree, with respect to the specific intent to kill, but also with respect to the essential factors of premeditation and deliberation. On this matter the court said, in State v. Williams, supra, 122 Iowa 115, 123, 97 N. W. 992, 995:

"It is manifest, then, that drunkenness should be considered, not only in its bearing upon the question of malice and intent, but, when murder in the first degree is charged, upon the question of willfulness, premeditation, and deliberation as well, for these are important considerations in determining the degree of the offense. The very essence of the crime of murder in the first degree is premeditation and deliberation, and, if these be absent, the crime is not higher, under ordinary circumstances, than murder of [in] the second degree. Hence any facts which

go to show a state of mind incapable of deliberation and premeditation should be considered. Hence it is generally held that evidence as to the intoxication of the defendant should be considered as bearing upon the question as to the degree of his offense. [Citing State v. Sopher, supra, 70 Iowa 494, 30 N. W. 917, and decisions in other jurisdictions.] * * * Indeed, there seems to be no dissenting voice in the authorities on this proposition.''

In State v. Wilson, supra, 166 Iowa 309, 322, 144 N. W. 47, 52, the defendant was tried for murder in the first degree and convicted of murder in the second degree. The court said:

''If the accused, at the time of committing homicide, was so drunk as to be incapable of premeditation or of forming any deliberate intent, and there is no evidence of having premeditated the crime prior to becoming intoxicated, murder in the first degree is not made out * * *.''

And in the supplemental opinion, 166 Iowa 327, 147 N. W. 740, the court said:

''But if there is evidence of provocation which, if acted upon immediately by a sober man, would be regarded as sufficient to reduce the offense to manslaughter, and the inquiry is whether the accused actually acted thereon, it is held by the weight of authority that evidence of intoxication may be considered in deciding whether the fatal act is to be attributed to malice, or to the passion of anger, excited by the previous provocation; such passion or anger being more easily excitable in an intoxicated person than in one who is sober. [Citing authorities.] * * * This much has been said to indicate when and for what purpose evidence of intoxication may be considered in determining whether the killing was murder in the second degree or manslaughter. There was evidence of provocation which, if believed, must have been found sufficient, and if acted on by the accused while under the dominion of passion, rather than because of previous malice, would have reduced the offense to manslaughter. The court might well have told the jury that in passing on the issue of whether defendant, in what he did, the provocation having been found sufficient, was dominated

by passion or previous malice, the evidence of intoxication might be considered.''

The opinion in State v. Wilson, supra, gives little information with respect to the intoxication, but the issue was submitted to the jury under proper instruction.

In State v. Sopher, supra, 70 Iowa 494, 495, 499, 30 N. W. 917, 918, the defendant was convicted of first-degree murder of his father. They and a companion had been drinking in the village and took with them two bottles of the liquor on their way home in a spring wagon. The opinion states:

"They were under the influence of the liquor, and to some extent intoxicated, while pursuing their way homeward.''

The father used violence toward the son, and in the altercation the son stabbed his father eleven times with a pocketknife. The court instructed on intoxication but not fully nor to the point. But in reversing because the State had not proved premeditation or deliberation, the court said, speaking of the blows:

"They were given in a conflict while defendant was excited by intoxicating liquors, if not intoxicated. There is no evidence tending to show that after the conflict began there could have been, before the stabbing, a moment,—an instant of time,—for deliberation and premeditation. Certainly, there is not one word of evidence tending to prove that, before the conflict commenced, there was premeditation and deliberation.''

In Sutton v. Greiner, 177 Iowa 532, 538, 159 N. W. 268, 271, the action was for damages resulting from defendant's failure to perform a real-estate contract which he claimed was executed through fraud. There was evidence that the plaintiff had prevailed upon the defendant to drink either two pints or two quarts of beer. Plaintiff complained that the court erred in instructing on the issue of intoxication, since there was no evidence to justify such instruction. In holding that the issue as to the defendant's condition was for the jury, the court said:

"It is not charged or claimed that he was intoxicated to a degree rendering him helpless, or even wholly incompetent to

do business, but the fact of drinking freely and its natural effect upon him are material circumstances in the transaction with which the jury was properly made acquainted, and the court's instruction with reference thereto was not improper."

In State v. Coleman, 226 Iowa 968, 973, 285 N. W. 269, 271, the defendants were accused of first-degree murder and convicted of second-degree murder. The only evidence of drinking was introduced by the State over defendants' objection, and "consisted in showing that the defendant [Coleman] had half a pint of whisky with him that afternoon and that he had taken one or two glasses of beer." This court said:

"We are of the view that there was no error in admitting this testimony. While it is not claimed the defendant was intoxicated, the admission of testimony as to the general condition, appearance and manner of the defendant at a time so near the occasion of the encounter with Conrey was both relevant and material."

In State v. Salmer, 181 Iowa 280, 282, 283, 164 N. W. 620, the defendant was tried for manslaughter by means of reckless conduct. The State introduced testimony by one witness that:

" 'Defendant was drinking that night. I won't say that I smelt intoxicating liquor * * *. After the accident, the defendant drove the automobile to the hospital with the boy in it.' "

Another witness testified:

" 'Defendant was drinking, to my notion. I smelled intoxicating liquor on him. The car was going between 20 and 30 miles an hour.' * * * The policeman who arrested the defendant testified that defendant was intoxicated when he came to the station about 10 minutes of 9 that night. He seemed to be able to walk upright and all right. He came to the station in his own car. * * * *Under the evidence, it was an open question for the jury* as to whether the defendant was under the influence of liquor immediately before and at the time of the accident, and a finding either way would have some support in the evidence. * * * It is a matter of common knowledge that the con-

duct of men is greatly influenced by the condition they are in at the time they are called upon to act; that men under the influence of liquor do not possess the same cool judgment and discretion that men possess when not under its influence. * * * *The condition of the defendant as to intoxication was a matter of great probative force upon the ultimate question to be solved by the jury.''* (Italics ours.)

The court expressed no opinion on the fact issue of intoxication since it reversed on another ground.

So, too, in this case, the submission of the issue of the appellant's mental condition, under proper instruction, ''was a matter of great probative force,'' on the issue of specific intent, and also upon the issues of premeditation and deliberation. The case of the State was far from strong on these questions. The deceased and the appellant were almost strangers. There had been no controversy or bad blood between them. There had been no previous preparation by appellant. There may have been some noisy argument as the result of their drinking. The deceased was drinking at the expense of appellant and on the latter's invitation. Appellant had made no threats. He left the house to go home. The deceased followed him and appellant says deceased jumped onto him and they went to the ground. They were separated and each arose and appellant went to the front of the car and the deceased to the rear. Appellant says decedent then approached him with a club in his hands and, with an oath, said he would ''knock his head off.'' Appellant says that the decedent then struck him three heavy blows with the club before he could take it from him. The injuries which he received and the testimony of those who examined his injuries most strongly confirm his testimony. Then he states that the decedent approached with a knife, saying he would ''let his guts out.'' There is also corroboration for this, not only by testimony for the appellant but the prosecution told the jury in its opening statement that the State could produce a witness who would so testify. It was while decedent was approaching him and after he had made a lunge at him that the appellant said he struck him one blow on the head and Bolden fell. The latter's knife was found under him. The officer who found it

said it was closed. There is strong warrant for finding that deceased was struck after the appellant had received a hard, bruising blow at the base of the brain, which may well have numbed a brain already dulled by liquor. The fact that such a blow was received by the appellant is strong additional reason why the defense of intoxication should have been submitted to the jury. Certainly the effect of the liquor upon his brain was a fact for the jury to determine, just as it was its duty to determine who was the aggressor, and whether the State had established beyond a reasonable doubt that the defense of self-defense was not tenable. State v. Conners, supra, 95 Iowa 485, 486, 64 N. W. 295; State v. Busse, supra, 127 Iowa 318, 323, 100 N. W. 536, 538, the court saying: "If there had been affirmative evidence of intoxication, the instruction asked, or a similar one, should have been given." State v. Ockij, 165 Iowa 237, 249, 145 N. W. 486; State v. Bell, supra, 29 Iowa 316, 319, the court saying:

"Whether he had the intent charged, whether he was capable of conceiving it, or whether he was so completely overcome by his debauch as to be incapable of forming any purpose, were questions for the jury."

Whether the jury was warranted in sustaining either issue for the State may well be questioned. The testimony of the Stewart children, the Phipps girl, and Golda Morgan, if accepted as true, gives little aid to the State on these issues. The testimony of the coroner was that the clean-cut, four-inch wound on the head was made, in his opinion, with a single blow, and that it would have produced unconsciousness. Golda Morgan testified that Bolden was standing during the six or seven minutes that she watched the club striking him on the left shoulder and that he was still standing when she left. There was not a scratch or bruise on the shoulder or any part of the body or limbs of the deceased. The physical facts as evidenced, without dispute, by the body of the deceased clearly show that it was impossible that the deceased received such a beating as these witnesses said he received. Two or more of these witnesses spoke of one or two white men holding Bolden while he

was being beaten, and one testifies that no one held him or was near him at this time. Punk Wing Rogers was a witness before the grand jury. He was not a witness at the trial. Clarence Wilson said that he and Rogers went out when they heard the first scuffle. The deputy sheriff, testifying for the State, told of his investigation that night. In his testimony he said:

"Q. What was said and by whom? A. I started to tell Fritz [the sheriff] what happened and Punk Wing started to talk and I told Punk to go ahead and tell what happened. Q. What did he relate? A. Just that they had been fighting. ·Q. How many did he say had been fighting? A. *Glen and Harry Bolden.*"

We have cited all of the cases, so far as we could find, in which this question of the intoxication of or the effect of intoxicating liquor upon the accused has been before the court. In most of the cases the question was submitted to the jury, and the complaint of the accused in those cases has been against the correctness of the instructions. In other cases this issue was not submitted because it was not interposed as an affirmative defense. See State v. Heinz, supra, 223 Iowa 1241, 1257, 275 N. W. 10, 114 A. L. R. 959, a particularly revolting crime; State v. Johnson, 215 Iowa 483, 245 N. W. 728, in which the request was clearly erroneous, and the court held the defense was not available because of the crime for which defendant was convicted; State v. Johnson, supra, 211 Iowa 874, 234 N. W. 263 (first trial), the testimony was weak, and the requests clearly erroneous, and the reversal was on other grounds; State v. Walker, supra, 200 Iowa 341, 204 N. W. 215, there was affirmative testimony of realization by the defendant; the same is true in State v. Crietello, supra, 197 Iowa 772, 197 N. W. 902. In other cases where the evidence of intoxication was less or no more than shown in this case the failure of the court to submit the issue to the jury was held reversible error. In State v. Williams, supra, 122 Iowa 115, 116, 97 N. W. 992, 993, the opinion states that, "All were drinking, and more or less intoxicated." As in this case, they were arguing about horse racing. The defendant drove a team to the place of drinking. In pursuing about the room the one with whom he was quarreling

he shot a man behind whom the other was hiding. He drove his team six miles on the way to Albia. When accosted on the road he said he was sick and fell out of the buggy. He then walked a mile to Albia, boarded a night train there for Ottumwa, where he was arrested two days later. This court held that the evidence tended to show the defendant was drunk, and reversed a judgment of murder in the first degree because the issue of intoxication was not submitted.

In State v. Desmond, supra, 109 Iowa 72, 81, 80 N. W. 214, 217, the defendant was convicted of attempt to commit rape on an eleven-year-old girl. Two girls, age thirteen, were assaulted at the same time. He and his wife and another married couple had been conducting a medicine show in a public hall from 2 to 4 o'clock p. m. No one observed any intoxication during this time. He arranged with the children to have them stay. There was no evidence of intoxication as he went about his revolting work. An hour afterward he was found in a stupor. On his person was an empty three-ounce vial which may have contained a narcotic. There was a bottle, size not shown, containing a small amount of gin, and a gallon jug two thirds full of port wine. There was evidence that he was "somewhat intoxicated" during the afternoon. In reversing, this court said:

"The record shows that the omission of the court to present the defense of intoxication may have been highly prejudicial to the defendant."

In State v. Bennett, supra, 128 Iowa 713, 716, 105 N. W. 324, 326, "the evidence *tended* to show that the defendant was drunk when he shot Colwell *. * *." (Italics ours.) The court reversed a judgment for assault with intent to commit manslaughter because no instruction on the issue of intoxication was given.

Our latest decision touching this question is State v. Graff, supra, 228 Iowa 159, 174, 290 N. W. 97, 103, in which the defendant was convicted of manslaughter caused by his wanton and reckless disregard for the safety of others. There was evidence, but much less than appears in this case, that the defendant "was under the influence of intoxicating liquor to some extent

at the time of the fatal injury." The defendant requested an instruction that there was no evidence that he was operating his automobile while intoxicated. *The court so instructed.* This court said:

"In the balance of said instruction, the jury was advised *that the use of intoxicating liquor by the defendant might be considered in determining whether or not he acted in a reckless disregard for the safety of others.* This instruction would seem to be warranted by the language quoted from the case of State v. Salmer, supra [181 Iowa 280, 282]." (Italics ours.)

█ It is our conclusion that the court erred in not instructing upon the matters covered by the requested instructions, particularly the third one. It was a correct statement of the applicable law. It was given in State v. Wilson, supra, 166 Iowa 309, 144 N. W. 47, 147 N. W. 739. But even though any of the instructions requested may have contained erroneous statements of law, if they were matters upon which the court should have instructed, but did not, the court committed error in not properly instructing upon them when thus called to its attention. This is the rule in civil cases, and, by stronger reason, it is, and should be, the rule in criminal cases. This issue was an affirmative defensive matter, and it should have been submitted to the jury with proper instructions.

"An accused person is entitled to have his theory of the case explained to the jury and the law stated applicable thereto." State v. Brooks, 192 Iowa 1107, 1117, 186 N. W. 46, 51.

As said in State v. Helm, 97 Iowa 378, 385, 66 N. W. 751, 753:

" * * * it is the duty of the court to instruct the jury upon the material questions of law in the case, whether requested to do so or not."

See, also, State v. Graves, 192 Iowa 623, 626, 185 N. W. 78; section 13876, Code, 1939.

█ II. The court, without request, in its first instruction to the jury, stated that the defendant "did * * * willfully, deliberately, feloniously and with premeditation and malice

aforethought, and with the specific intent to kill, murder one Harry Bolden. * * * and before the State will be warranted in asking a verdict of guilty at your hands, it must have satisfied you from the evidence, beyond a reasonable doubt of the truthfulness of all such *material* allegations. *If you are so satisfied, you should convict the defendant.* If you are not so satisfied, you should acquit him.'' (Italics ours.)

The appellant assigns error for the giving of this instruction upon the grounds that the issue of self-defense was wholly omitted from the burden of the State; under the instruction the jurors were authorized to convict the appellant upon any of the offenses submitted without giving any consideration to his defense of self-defense; an instruction which attempts to include all of the elements necessary to sustain a conviction is reversible error, when it ignores the defense relied upon by the defendant; the instruction is complete within itself and authorized a verdict of guilty if the jury found in favor of the State. upon the issues presented therein, without regard to any issue presented by the appellant; the instruction failed to direct the jurors that they might consider any provocation or justification for the assault of the appellant; when a court lays down the correct rule in one instruction, and an incorrect rule in another instruction, it is impossible to tell whether the jury followed the correct rule or the incorrect rule.

There is merit in the appellant's contention. The instruction was a straight, unambiguous direction to the jury that if it found the allegations of the indictment true beyond a reasonable doubt it should convict the appellant. All of the recited allegations were material, but the instruction permits the jury to determine the materiality of any of them. The jury was directed to so convict without regard to any defense submitted by the appellant. There was no provision, exception, or qualification noted that the jury should consider any provocation or justification for the killing. There was no direction in the instruction that in arriving at a verdict of conviction or acquittal the jury should, or was even authorized to, consider the issue of self-defense, ''as hereinafter set out in these instructions.'' The only factors the jurors were told to consider in arriving at a verdict

were the *material* allegations of the indictment. The main defense—the defense which was a defense to every offense submitted—was wholly excluded from the consideration of the jury by this instruction. The instruction, on its face, is complete in itself. It purported to cover the entire case, and so told the jury. It directed a conviction of murder in the first degree if the jury found for the State on the issues presented in the instruction. The instructions were long and somewhat repetitious. The jury, of course, heard them read, but, if after retiring and the foreman read the first instruction, it was suggested that each instruction be taken up and disposed of as they went along, the jury would have been fully warranted by the language of the instruction, in saying, ''We need go no further. Here is a terse command to convict if we have no reasonable doubt of the truth of the allegations of the indictment as set out in this instruction. We have no such doubt.''

This question was directly passed upon by this court in State v. Rourick, 211 Iowa 447, 448, 233 N. W. 509, 510. After calling attention to the well-known rule that when the accused interposes the defense of self-defense, the burden is upon the State to prove beyond a reasonable doubt that the defendant was not acting in self-defense, the court, speaking through Albert, J., said:

''In Instruction No. 1, the court, among other things said: 'In order to convict the defendant, the State must show, by the evidence before you, and beyond a reasonable doubt, all of the following matters: (1) That, on or about May 25, 1929, the defendant did strike the said Claud Kitelinger. (2) That said striking was willful and unlawful. (3) That said offense, if any, was committed in Cass County, Iowa.' Instruction No. 4 reads as follows: 'If the State has shown by the evidence before you and beyond reasonable doubt all of the foregoing material matters, then you should convict the defendant.' *It will be noticed that, under this last instruction, the question of self-defense is wholly omitted from the burden of the State.* There was abundant evidence to carry this question to the jury, *and in fact it was the real issue raised by the defendant; yet, notwithstanding this situation, under Instruction No. 4, the jury*

*was authorized to convict the defendant without giving any consideration whatever to the issue thus raised by him.* The only thing further said on this subject is in Instruction No. 10, reading as follows: 'The defendant claims that what he did, if anything, in the way of striking said Claud Kitelinger was what is commonly known as self-defense. Our statute provides that lawful resistance may be made by a party about to be injured, to prevent an offense against his person, and under this statute, a person may lawfully resist an unlawful attack or unlawful assault upon his person; and in this case, the burden is upon the State to show not only that the defendant assaulted said Claud Kitelinger, but also to show said assault was unlawful.'

"*A simple reading of this last instruction shows that it in no way remedies the error committed in Instruction No. 4.* * * * For the errors pointed out, the case is—Reversed." (Italics ours.)

This decision stands as the law on this particular question. We have found no applicable decisions to the contrary. The State cites none. Decisions from other jurisdictions support the contention of the appellant and the law as stated in the Rourick case.

Other decisions holding that, where a peremptory instruction of the type given by the trial court ignores the theory of the defense interposed, whether it be self-defense, insanity, or any other defense having support in the record and which would warrant an acquittal if believed, it is reversible error, are State v. Helton, 234 Mo. 559, 137 S. W. 987; People v. Kowalski, 322 Ill. 167, 163 N. E. 399–401; People v. Dascola, 322 Ill. 473, 153 N. E. 710; People v. Spranger, 314 Ill. 602, 145 N. E. 706; People v. Casino, 295 Ill. 204, 129 N. E. 145, 34 A. L. R. 1102; State v. Mehaffey, 194 N. C. 28, 138 S. E. 337, 338; Wessells v. Commonwealth, 164 Va. 664, 180 S. E. 419 (insanity); Harris v. Commonwealth, 161 Va. 1028, 170 S. E. 717, 718 (justifiable possession of a still); Commonwealth v. Williams, 309 Pa. 529, 164 A. 532 (insanity); State v. Collins, 292 Mo. 102, 237 S. W. 516, 519 (good faith in belief that alleged stolen cow belonged to defendant); People v. Penman, 271 Ill. 82, 110 N. E. 894, 900 (self-defense); State v. Slusher, 301 Mo. 285, 293, 256 S. W.

817, 819 (The court said: ''The vice of the instruction is that it purports to cover the whole case, and authorizes a verdict without taking into consideration the defenses offered by the defendant to the effect that he bought the boat—came by it honestly''); State v. Harris, Mo., 267 S. W. 802; State v. Busch, 342 Mo. 959, 119 S. W. 2d 265, 269; Peyton v. State, 16 Okla. Cr. 410, 183 P. 639, 641; State v. Price, 83 W. Va. 71, 97 S. E. 582, 583, 5 A. L. R. 1247; People v. Krauser, 315 Ill. 485, 146 N. E. 593, 604, 605 (insanity).

We have held in civil cases that a positive statement of the essentials of recovery in one instruction, without any qualification, and without mention of pleaded defenses having support in the evidence, and without reference in the criticized instruction to such defenses in other instructions, is reversible error which is not cured by the later instructions. See Hoblit v. Oldemeyer, 229 Iowa 1085, 1090, 296 N. W. 210, written by Justice Wennerstrum; Smith v. Middle States Util. Co., 224 Iowa 151, 159, 161, 275 N. W. 158, 164; McDivitt v. Des Moines City Ry. Co., 141 Iowa 689, 696, 118 N. W. 459; State v. Keasling, 74 Iowa 528, 38 N. W. 397; Hawes v. Burlington, C. R. & N. Ry. Co., 64 Iowa 315, 319, 20 N. W. 717; Hoover v. Haggard, 219 Iowa 1232, 1237, 260 N. W. 540; Kerr v. Topping, 109 Iowa 150, 156, 80 N. W. 321; State v. Glaze, 177 Iowa 457, 460, 461, 159 N. W. 260; Mester v. Zaiser, 143 Iowa 623, 626, 627, 120 N. W. 466; Cox v. Cline, 139 Iowa 128, 131, 117 N. W. 48; State v. Hartzell, 58 Iowa 520–522, 12 N. W. 557; Hoeft v. State, 221 Iowa 694, 702, 266 N. W. 571, 575, 104 A. L. R. 1008. (The court said: ''It is the rule of law in this state that, where instructions are conflicting and inconsistent with each other, they are necessarily prejudicial.'')

The State argues that the instructions must be read together. We concede this. But, as stated in Hoblit v. Oldemeyer, supra, 229 Iowa 1085, 296 N. W. 210, this rule is not always applicable. Reading the instructions together does not always cure the error. It cites State v. Hartwick, 228 Iowa 245, 249, 290 N. W. 523, but, as was said by Justice Hale therein, Instruction No. 5, the one complained of, was not complete in itself and was not so intended. It cites State v. Heinz, 223 Iowa 1241, 1256, 275 N. W. 10, 114

A. L. R. 959, which merely states the general rule that instructions should be considered in their entirety. The reference was to a situation not similar to the one being discussed. The only other case cited by appellee is State v. McDowell, 228 Iowa 180, 188, 290 N. W. 65, which does not aid it. In fact, the opinion supports the decision in State v. Rourick, supra, 211 Iowa 447, 233 N. W. 509, by distinguishing it.

In the case at bar, the court, in Instruction No. 11, gave to the jurors the essentials which authorized them to return a verdict of murder in the first degree if they found that the assault "was not justifiable or excusable nor done under such provocation as to reduce it to manslaughter." But reading and considering it and other instructions in connection with Instruction No. 1, does not remedy the error complained of. Instructions No. 1 and No. 11 were contradictory; the first was improper, and the second was proper. But who can say which the jury followed? We have given the right answer a number of times. In State v. Hartzell, supra, 58 Iowa 520, 522, 12 N. W. 557, 558, the court said:

"But the best that can be said is two rules have been laid down for the guidance of the jury and they may have adopted the erroneous instead of the correct rule."

In Kerr v. Topping, supra, 109 Iowa 150, 156, 80 N. W. 321, 323, we said:

"When conflicting instructions are given, one of which announces a correct, and the other an incorrect, rule, the case must be reversed, for there is no means of knowing which one the jury followed."

To the same effect, see State v. Glaze, supra, 177 Iowa 457, 461, 159 N. W. 260. As said by Weaver, J., in Cox v. Cline, supra, 139 Iowa 128, 131, 117 N. W. 48, 49:

"It is probably true that the correct rule can be deduced from other instructions given, but this we think cannot serve to remove or neutralize the prejudice presumably resulting from the unqualified statement in the seventh paragraph."

Instruction No. 1 should have been limited to a statement

of the indictment. It was error for the reasons given, and, because of No. 11, it was also repetition and overemphasis of the subject matter.

III. Appellant complains of misconduct on the part of the prosecuting attorneys, and rulings of the trial court with respect thereto, in connection with having eight of the deceased's small children within the bar or front railing of the courtroom, and because of improper questions asked of the widow, and improper closing argument. There is basis for the complaint. In view of the fact that these matters will not occur on· any retrial, and because of a reversal on other grounds, we do not discuss them.

IV. Error is assigned for overruling appellant's motion for continuance of the trial. This is a matter which will hardly arise on a retrial. We therefore pass it.

V. ·Appellant attacks the ruling of the court in sustaining the State's challenges for cause against three jurors who had conscientious scruples against capital punishment. Our decisions in State v. Lee, 91 Iowa 499, 502, 505, 60 N. W. 119, ·and State v. Rocker, 138 Iowa 653, 660, 116 N. W. 797, sustain this assignment of error.

VI. The appellant requested an instruction that the charge of murder in the first degree be withdrawn from the jury because of lack of evidence to sustain it. It is our judgment that such an instruction should have been given.

The essentials of murder in the first degree are malice aforethought, premeditation, deliberation, and specific intent to kill. If one of these is lacking the offense is not established. We have set out the evidence bearing upon these elements quite fully, and from it we find that many of the factors, circumstances, and conditions present in most cases of first-degree murder are lacking here. The extreme importance of our decision, to both the public and the accused, prompts us to a restatement of some matters having a most important bearing upon the question for determination.

The deceased and the appellant met that afternoon wholly without intention or plan on the part of either. They knew each other before but there was nothing in their relations to

cause either to have any feelings for or against the other. There was no preparation on the part of either for trouble. There was no serious trouble in the house. There was noisy argument and braggadocio on the part of all of them. The appellant, with his brother Albert, left the house to go home in the latter's car. Bolden followed them very shortly. There is no dispute about this. Twelve-year-old Donald Padgett, whose testimony was straightforwardly given, said that the colored man followed the white man over to the flower bed and that is where the fight started. They scuffled some on the ground, and the colored man, as he was getting up, knocked a bottle from the hand of one of the men, who struck at him with it. The appellant said that Bolden was the aggressor in this scuffle. They arose and quit fighting and separated. In the fight which followed there is uncontradicted evidence that Bolden picked up a club and stated that he was going to knock the appellant's head off and that he attempted to do so. It is undisputed that the appellant had four injuries, apparently from the blows of a club. It would be the merest conjecture to say that he received them from anyone but the deceased. Appellant said that he wrested the club from the deceased, and that the latter then said he would "cut his guts out," and advanced upon him with a knife in his hand. The appellant testified he then struck him one blow over the head in self-defense as Bolden attacked him. There is testimony corroborating the appellant. There is no direct or indirect testimony to the contrary. The injuries on the appellant and upon the body of the deceased quite convincingly confirm this version of what took place. Appellant made no attempt to get away or to cover up. He was badly bruised and went with Albert in the car, while the latter called the police station for a doctor and the ambulance. They returned to the scene of the fight and waited for the officers to come. He told them what took place, as stated above. He has never told anything different so far as the record shows. The investigation of the officers that night disclosed nothing inconsistent with the account of the appellant. They found the club with a bloody mark on it, and they found the pocketknife of Bolden. There was another club found, and it was an exhibit, but no claim is made that it was used by anyone. Here was an

affray which fairly appears to have been the outcome of excessive drinking. It was not a case of getting drunk to commit any kind of an assault. Certainly, it was not an affray that had been contemplated. There was no lying in wait, and no killing in the perpetration of any other crime. Nor, in our judgment, was there any killing which fairly comes within the provisions of Code section 12911, defining first-degree murder. It cannot be said that there was any predeliberation or premeditation in advance of the physical encounter. If there ever existed any premeditation and deliberation it arose, if at all, during the encounter. At what stage in the encounter, if any, could it likely have arisen? After they separated from the scuffle on the ground the appellant went toward the front door of the car to get in. Bolden and Albert walked to the rear of the car, the latter with his arm over Bolden's shoulder. There is no evidence that appellant contemplated any further altercation. Then it was that Bolden began the assault with the club. It is not reasonable to suppose that the appellant contemplated killing Bolden with his bare hands while he was being attacked with the club. His testimony was that he tried to protect himself. If there was a specific, willful, and premeditated intent to kill, it most likely arose, if at all, when he secured the club. At that time his right forearm and upper right arm and shoulder were severely bruised. He was left-handed and would naturally use his right arm as a shield. He had a bruising blow on the angle of his jaw, and a hard, abrasive blow over the right mastoid. He testified he had a roaring in his head. There is evidence that he still backed away and in doing so knocked down his crippled brother Clarence. He struck the fatal blow when Bolden advanced upon him with the threat that he would disembowel him. It is in the record that deceased was called "Razor" Bolden. He was so known to the appellant.

The burden was upon the State to establish each essential element of first-degree murder beyond a reasonable doubt. It is the law, many times stated by this court, that the deliberation and premeditation required need not exist for any particular length of time. They must exist before and at the time the fatal blow is given. But the inception of their existence

need be only but an instant before the fatal blow. State v. McPherson, 114 Iowa 492, 497, 498, 87 N. W. 421; State v. Fuller, 125 Iowa 212, 100 N. W. 1114; State v. Hockett, 70 Iowa 442, 449, 30 N. W. 742; State v. Woodmansee, 212 Iowa 596, 611, 233 N. W. 725; State v. Matheson, 220 Iowa 132, 138, 261 N. W. 787. The question is not only, Did the accused have time to think, but did he think? The important factor is the latter. If it were not, one denying premeditation and deliberation would be helpless, because he could never disprove the existence of the instant of time. Premeditation means to meditate or deliberate before concluding to act.

"Premeditation can have no defined limits, as to the time of its commencement before the killing. Every case must rest on its own circumstances, for it is impossible to furnish any safe and uniform standard in this particular." State v. Johnson, 8 (Clarke) Iowa 525, 530, 74 Am. Dec. 321, 325.

Before a jury or a court can rightly determine whether there was premeditation and deliberation there must be some evidence, direct or circumstantial, tending, at least, to establish it. It cannot be conjectured, nor can it be inferred unless there is some fact or facts from which the inference can be reasonably drawn. The appellant had been drinking beer and whisky with water chasers for several hours and right up to the time of the homicide. So much so that he was dazed that night and the next morning, and the effects of liquor were still apparent to the wife of the sheriff and the attending physician. The natural effect of such drinking would be to dull his mental faculties and retard and confuse his thinking. The blows which he received were of such force as to aggravate this condition. He testified he was defending himself against the renewed attack of one who had clubbed him and was then attempting to carry out a threat to use a knife upon him. In this situation and under these circumstances he claims he struck the blow which killed the deceased. There are no presumptions which aid the State in establishing premeditation and deliberation. The fact that appellant used a deadly weapon in the homicide would afford a presumption of malice had there been no sufficient provocation or justification for the blow. But

even without the circumstances of provocation, mitigation, or justification, the presumption of malice arising from the intentional killing would make the offense, not first-degree, but second-degree, murder. While malice and intent to kill, both essentials in either degree of murder, may be inferred from a homicide with a deadly weapon, such a killing affords no inference or presumption of deliberation and premeditation, the other essentials of first-degree murder. State v. Phillips, 118 Iowa 660, 677, 92 N. W. 876; State v. Leib, 198 Iowa 1315, 1322, 1323, 201 N. W. 29; State v. O'Donnell, 176 Iowa 337, 340, 341, 157 N. W. 870; State v. Wilson, supra, 166 Iowa 309, 321, 144 N. W. 47, 147 N. W. 739; State v. Johnson, supra, 211 Iowa 874, 879, 234 N. W. 263; State v. Brewer, 218 Iowa 1287, 1297, 254 N. W. 834; State v. Matheson, supra, 220 Iowa 132, 137, 261 N. W. 787; State v. Sopher, supra, 70 Iowa 494, 30 N. W. 917.

A somewhat similar case, in that the accused and the decedent were considerably intoxicated and while engaged in a struggle for a gun it was broken and the defendant killed the other by a blow over the head with the gun barrel, is State v. Leib, supra, 198 Iowa 1315, 201 N. W. 29. A verdict of first-degree murder was held not to be sustained by the record.

In State v. Phillips, supra, 118 Iowa 660, 92 N. W. 876, the accused was a bank robber who shot one of a posse seeking to capture them. A verdict of guilty with a death penalty was reversed. In State v. O'Donnell, supra, 176 Iowa 337, 341, 157 N. W. 870, 871, the defendant killed his wife in a most brutal manner. A verdict of first-degree murder was reversed. The court there said:

"While the essential premeditation need not be of long duration, and may be established by inferences justifiably to be drawn from the circumstances attending the crime in inquiry, it will be found that these are more often than otherwise drawn from the nature of the .weapon employed, if any, and the manner of its use (Commonwealth v. Woodward, 102 Mass. 155), or drawn from the manner of obtaining the weapon, and from evidence bearing on whether it was provided by accused beforehand, *rather than seized hastily in the heat of an affray."* (Italics ours.)

We call particular attention to State v. Sopher, supra, 70 Iowa 494, 30 N. W. 917, quoted from in Division I.

In State v. Nolan, 92 Iowa 491, 61 N. W. 181, the defendant and the man he killed had been doing considerable drinking. There had been some bad feeling between them. There was evidence that the defendant had said he would get even with the decedent if he had to kill him. He claimed the death was caused by the team running away, but the dying statements of the victim were to the contrary. A verdict of first-degree murder with life imprisonment was held not established by the evidence.

We reach the same conclusion in this case. We are not trying this case de novo, but neither are we concluded by a verdict which is against the clear weight of the evidence. The evidence upon which the State relies to sustain the verdict and judgment is the testimony of the Stewart sisters, Charlotte Phipps, and Golda Morgan. We have already stated that their testimony respecting the beating which they say Bolden received is incredible because of its inconsistencies and its complete refutation by the physical facts as shown by the single wound on the body of Bolden. None of them claims to have seen the blow which knocked Bolden down or what took place immediately before. One of them testified that Bolden was being beaten when she came and also when she left. One of these witnesses, Juanita, admitted that she had told the attorneys for the defense when they were investigating the facts, only "half" the truth, *and that she did not return to the scene of the affray from the Padgett home,* where she had gone with all of the other children, after the scuffle on the ground, when Mr. Padgett called them. The defense sought to impeach her sister by showing that she had stated 'that she had told a lot of lies about the State v. Wilson case, and what she saw at the Punk Wing home on the night of June 15, 1943, and that the next time she would know enough to keep her mouth shut. The impeaching witness was not permitted to answer upon objection that proper foundation was not laid. The ruling was perhaps right, as the impeachment was too general and not on a specific statement, but the court, in its discretion, might well have allowed the answer.

This court has uniformly been less reluctant to set aside a verdict which is contrary to the evidence in a criminal proceeding than in a civil action. State v. Carson, 185 Iowa 568, 570, 170 N. W. 781; State v. Saling, 177 Iowa 552, 555, 556, 159 N. W. 255; State v. Wise, 83 Iowa 596, 599, 50 N. W. 59; State v. Sullivan, 156 Iowa 603, 606, 137 N. W. 918; State v. Klein, 218 Iowa 1060, 1064, 256 N. W. 741. There should be no hesitation to set aside a judgment in any case if it is against the clear weight of the evidence.

A trial for first-degree murder places a particularly grave and responsible duty upon an appellate court. We repeat the words of Justice Faville, in his dissenting opinion in State v. Woodmansee, supra, 212 Iowa 596, 630, 233 N. W. 725, 741, to wit:

"No matter how heinous the offense or how merited punishment may be, our bounden duty is to declare the rules of law, without sympathy and equally without a spirit of revenge. In the discharge of this solemn and unenviable duty we have but one guide and that is to discover and pronounce the correct rules of law applicable to the case."

■ VII. Appellant assigned error because of the refusal of the court to give his requested instruction that the offense of second-degree murder be not submitted to the jury. It is our conclusion that the request should have been granted. Much that we have said in Division II, and the division just preceding, has important bearing also upon this question. Those matters which disprove premeditation and deliberation disprove also malice aforethought and willful and felonious intent to kill. We agree with the conclusion of the court as expressed by Justice Weaver in State v. Borwick, 193 Iowa 639, 643, 187 N. W. 460, 462, thus:

"* * * no just-minded man could draw therefrom an inference of the malice essential to a finding of guilt of murder. The undisputed facts sufficiently rebut the inference or presumption of malice which might otherwise arise from the mere use of a deadly weapon."

The deceased jumped on the running board of defendant's automobile and began striking at the defendant. There was no direct evidence that he had any weapon but his fist. The car was on the edge of a deep ditch. The defendant shot his attacker. The car then went into the ditch. The court held that second-degree murder should not have been submitted and reversed a judgment for manslaughter.

The blow was struck under the provocation and in the heat of the encounter, under the circumstances noted. In State v. Johnson, supra, 211 Iowa 874, 880, 234 N. W. 263, 267, we said:

"If the intention to take life is formed on a sudden impulse, and immediately executed without deliberation, premeditation, or malice, the crime is not greater than manslaughter."

For the reasons noted herein, it is our conclusion that the judgment appealed from should be reversed. It is so ordered.— **Reversed.**

MULRONEY, C. J., and OLIVER, GARFIELD, WENNERSTRUM, HALE, and MANTZ, JJ., concur.

SMITH, J., concurs in result.

MILLER, J., dissents from Divisions VI and VII.