STATE OF IOWA, Appellee, v. GEORGE MATHESON, Appellant.

No. 42454.

JUNE 21, 1935.

Ben E. Kubby and Thomas O. Tacy, for appellant.

Edward L. O'Connor, Attorney General, Walter F. Maley, First Assistant Attorney General, and Robert B. Organ, County Attorney, for appellee.

HAMILTON, J.—This case is the outgrowth of another of the all too frequent illicit attachments between a man of advanced years and an amorous young woman, which so often have their climax in tragedy. The defendant is a man 53 years of age, who has been twice married, both wives being deceased. He had lived in Council Bluffs, Iowa, for 35 years. In the fall of 1931 he was living with his married daughter in Council Bluffs. He was employed by a grain company, first as laborer and afterwards as night watchman. During this time he met Grace Robinett, a young married woman, 23 years of age, who was estranged and living apart from her husband, Ted Robinett. They had one small child. The defendant met Grace one night in a restaurant. She said she was sick and unable to work, and spoke of her little girl and expressed a desire to get the child back. It appears that this child was residing with her husband in Tekemah, Nebraska. The defendant went with her to the husband's residence in Nebraska, with the result that they obtained the little girl and brought her back with them to Council Bluffs. The defendant testified: "They had no place to stay. I got them a place to stay and I stayed at my daughter's. Three or four nights later I got the little girl shoes and clothes and arranged for meals for them at the restaurant." He claims that Grace said there was no use of living in two separate places, and they obtained a place where they could live together and be by themselves. They lived together in this way for 14 months, or until about the middle of December, 1932. During this time he introduced Grace as his wife. He claimed to be living with her as his common-law wife, and on one occasion she joined with him in the conveyance of some real estate as his wife. During the time they lived together her mother, Mrs. Mary Lewis, resided with them.

It appears from this record that he was in love with this young woman and was greatly agitated because of their separation. He attempted reconciliation for several days after the separation. He followed her about on three different occa-

sions. She testified that when he came in contact with her on the street or in some place of business he would stand and look at her and follow her about and she had trouble avoiding him. She testified that at the time of their separation the defendant said to her that if she went with another fellow it would not be good for either of them. On the afternoon of the 3d day of January, 1933, his daughter handed him a note which read: "Make yourself scarce, and keep your nose out of my business and keep your mouth shut. I don't like the letter you sent to Ted. It is a lot of lies." On that day he purchased a revolver in Omaha from a man named Tony. He packed his suitcase and rented an automobile. The defendant admitted that he wrote a letter to Ted Robinett, in which he suggested that Grace was about to apply for a divorce, and that Ted could file a cross petition and obtain the custody of the child, and that if he needed any testimony he "could tell plenty." On the afternoon of the day of the shooting, he talked to his daughter about going over to where Grace Robinett lived. He claims that an unknown person called him on the street and told him that Grace wanted to see him. There is no other evidence that this actually took place, except the defendant's own statement, and Grace Robinett denies that she sent such a message to him. He was unable to identify the person who was the bearer of the message.

About seven o'clock on the evening of January 3d, he had his car filled with gasoline and drove his car west of Sixteenth street on Broadway and parked the same. This was about half a block from where Grace Robinett lived. He took the revolver from the pocket of the rented car and placed it in his coat pocket and proceeded to the home of Grace Robinett. On this particular evening, Charles Harris, a brother of Mary Lewis, and an uncle of Grace Robinett, and another man by the name of Arthur Poyner, were at the Robinett home. They were preparing to sit down to eat supper. The rooms occupied by Grace Robinett were on the second floor of the building. There was no one living in the rooms below and there was no light in the rooms below. The entrance to the rooms upstairs was through the lower story. The defendant entered the building and proceeded up the stairway. Grace Robinett testified that she heard a noise and went to the head of the stairs to see who it was. It appears that they were expecting a son of Charles Harris to dine with them on this particular evening. She claims that as the

defendant reached about the third step from the top of the stairs she recognized him, and that he was carrying a revolver in his hand. He pointed the gun at Grace and snapped the trigger, but the cartridge failed to explode. She rushed back into the living room from the hall, picked up her baby and placed the baby in a pantry. The defendant, following her, took about two steps into the apartment and said: "Everybody stand still," as he pointed the revolver directly at them. It appears that Charley Harris, who was seated at the supper table, arose from his chair and said: "What is going on here?" and reached for a camp chair. Mary Lewis and Grace Robinett were standing near where Harris stood; they were only a few feet from where the defendant was standing, pointing the gun. Arthur Poyner was just washing, and had reached for the towel, when he heard the statement: "Everybody stand still." He said that he looked up and the next instant there was a shot fired. He saw the flash of the revolver and saw Charley Harris fall to the floor. From the testimony of the other witnesses, it appears that Harris had taken one or two steps toward the defendant, and that the defendant had stepped back one or two steps before he fired the shot. Grace Robinett testified that he was pointing the gun directly at her, and when Charley Harris spoke he turned the gun on Harris. Mrs. Lewis ran to the window and called for help. Arthur Poyner was told to go get the police. Poyner never returned and never notified the police. The police, however, were notified by other parties who heard Mrs. Lewis shouting from the window.

It is the contention of the defendant that he went to this house in response to an invitation and thought he was welcome, although he admits that he had received the saucy note from Grace Robinett a few hours before. In the defendant's testimony he claims that as he stepped into the room, some one struck him over the head with a chair from behind the door, that he was knocked down, and he pointed to the scars on his face as evidence of this assault. Mary Lewis testified that the scars had been on his face prior to this time. Defendant also claims that after he was struck from behind the door, Charley Harris came at him with a knife, that Harris cut a long slit in his coat sleeve, and that the shooting occurred in a scuffle between the defendant and Harris. He did not produce the coat which he claimed had been cut with a knife, although he claims he left it with his

son-in-law, who was a witness at the trial, and there is little or no corroboration in the record to support his claim that he was assaulted. He immediately left the scene of the crime. Two different witnesses testified that they saw two men leave the house. One of them went toward Sixteenth street where the defendant had parked his car. The other one, no doubt, was Arthur Poyner. The defendant kept himself hid. Coming back to Omaha on the 5th of January, he wrote a letter to the newspaper in which he said: ''This is too much for me to stand. I am alone in the world and I know what it means to be hunted, so I am going to beat the law. By the time this letter reaches you, the river will claim my body tonight.'' He claims that he was planning to jump in the river, but changed his mind when he got to the bridge. He then traveled through several different states and finally came back to Council Bluffs, and during the dusk of the evening, obtained passage across the river to the home of his father-in-law near Council Bluffs. It was there the officers located him. He had crawled under the bed with his feet sticking out.

There is much confusion and many inconsistencies in his story. One cannot read the record without coming to the conclusion that the defendant was determined that if he could not live with this young woman, with whom he had lived for 14 months, no one else should have her. He was bent on mischief from the very day that they separated, as evidenced by the letter which he wrote to her husband on the 20th of December, 1932. In spite of the fact that she had written to him and told him to make himself scarce, he armed himself with a deadly weapon and went to her rooms with the evident purpose and intention of destroying her, and when Charley Harris came to her defense, he turned the weapon upon Harris and deliberately shot him. There is a contention that he did not use the gun as a deadly weapon, but took it from his pocket to use it as a club, but in his testimony he admits that he twice pointed the gun at his alleged assailants. He also admits that he said to them, ''Everybody stand still,'' but that this was after he had been assaulted. He also manufactures a bogeyman by saying that two men ran down the stairs ahead of him and that there was a man standing behind the door, although all the other occupants of the room were at or near the table a few feet away from the defendant

in plain sight, and they all testify to the deliberate killing of Charley Harris.

The evidence was sufficient to warrant the jury in finding that he prepared to escape before going to the home of his former paramour. He had packed his grip, rented a car, had the same filled with gasoline, parked it on a nearby street and proceeded with a gun, which he had purchased that very day, perhaps with the idea that he would take her life and then destroy himself, or make his escape in the rented car. The theory of the defense and the question presented by this appeal is that there was no deliberation or premeditation to take the life of the deceased, Charley Harris. We are abidingly satisfied that there was sufficient evidence under our prior holdings to warrant the court in submitting this question to the jury, and the jury has decided the case adversely to appellant's contention. The defendant entered the domicile of Grace Robinett with a pistol in his hands—he was prepared to kill. He deliberately pointed the gun at her and pulled the trigger. She miraculously escaped death when the gun failed to fire. He followed her into the living rooms and there commanded everybody to stand still, still pointing the gun directly at her. Charley Harris did the perfectly natural thing by attempting to avoid the shooting, but before he could take more than one or two steps forward, he was shot down by the defendant in cold blood. We think there was sufficient deliberation and premeditation and malice aforethought to warrant the court in submitting the question of first-degree murder, second-degree murder, and manslaughter to the jury.

"Malice aforethought, deliberation, premeditation, and intent to kill are all essential elements of the crime of murder in the first degree. Malice and an intent to kill may be inferred from the use of a deadly weapon in a deadly manner, but deliberation and premeditation may not be inferred therefrom. * * * An intent to commit murder is an intent to kill with malice. * * * the law warrants the inference of malice and of an intent to kill from the use of a deadly weapon in a deadly manner." Such was the holding of this court in the case of State v. Brewer, 218 Iowa 1287, at page 1297, 254 N. W. 834, 839.

" 'Premeditation and deliberation need not exist for any particular length of time before the killing, and may be proved by circumstantial evidence.' * * * 'If the accused * * *

had a fixed design or intent to maliciously kill said [deceased], and if the deliberation and premeditation were distinctly formed in his mind at any time before the fatal injury was inflicted, it is enough to justify a finding that it was wilful, deliberate, and premeditated.' '' State v. Griffin, 218 Iowa 1301, at pages 1307, 1308, 254 N. W. 841, 844.

That he was the aggressor we think is amply supported by the testimony of the witnesses who were present. The fact that he armed himself with a deadly weapon is in itself evidence of deliberation and premeditation under the circumstances in this case. Webster's New International Dictionary defines premeditation as: ''Consideration or planning of an act beforehand, such as to show intent to commit that act; as purchase of poison before a murder may show intent to commit murder.'' It is not necessary that this deliberation and premeditation exist for any particular length of time. It is sufficient if there was such deliberation and premeditation immediately before the fatal shooting, though it may have existed but for an instant of time. State v. Fuller, 125 Iowa 212, 100 N. W. 1114. Malice aforethought and intent to kill is evidenced by the deadly manner in which the weapon was used, and in the results which it accomplished. State v. Pinkerton, 201 Iowa 940, 208 N. W. 351; State v. Dillingham, 143 Iowa 282, 121 N. W. 1074; State v. Sullivan, 51 Iowa 142, 50 N. W. 572; State v. Hockett, 70 Iowa 442, 30 N. W. 742.

We conclude that there was no error in submitting to the jury the question of first degree murder.

■■■ Defendant's counsel also complain of the court's instructions, contending that the 4th paragraph of instruction 16 was erroneous, in that no limitation was placed on Harris' legal right to assault the defendant with a deadly weapon to repel an assault upon another. Likewise, that the court erred in giving to the jury instruction 15 for the reason that it attempts to state defendant's defense and ignores the claim of the defendant that he was not engaged in physical combat with Harris, but was backing away; that he is seriously crippled in both feet, could not turn about face, and could only back away slowly, and that the court should have instructed the jury on the right of the defendant to defend himself, based on his physical infirmity; that instruction 15, and especially paragraph 2 thereof, is erroneous, in that it placed an unlawful burden of proof

on the defendant, and that it was further erroneous in that the court in said instruction 15 tells the jury that Harris had a legal right to assault the defendant if defendant had committed a prior assault on Grace Robinett or any other occupant of the place. The two instructions complained of are as follows:

No. 15. "You are instructed that any person, in aid or defense of a person about to be injured, may make resistance sufficient to prevent the same.

"That is, any person has the same right to exercise the right of defense for another person to the same extent that he has the right to exercise the right of self defense in his own behalf; and that such person in the aid or defense of another about to be injured has the right to make resistance thereto sufficient to prevent the same.

"You are further instructed that the instructions herein given you relative to self defense are likewise applicable to the aid or defense of another person."

No. 16. "In determining a matter of this character it is important for the jury first to ascertain from the evidence which of the parties in question was the aggressor; that is, which of the parties made the first show of force and thus brought on the conflict.

"It is the rule of law that the one who is the aggressor and brings on the conflict and presses the combat cannot claim the benefit of the law of self defense to shield him from the consequences of having slain his adversary. It is only the one, who is acting on the defensive that can claim that right, or for whom it may be claimed.

"If you find from the evidence before you that the defendant was the aggressor at the time in question and made the first show of force and thus brought on the conflict and pressed the fight until his adversary was slain, then he cannot claim to have acted in lawful self-defense.

"Likewise, if you find from the evidence before you that the defendant at the time in question came to the place where the witness Grace Robinett was staying without believing that said Grace Robinett had requested him to come there, and came to said place and made an assault upon said Grace Robinett, or upon any other occupants of that place, by pointing a loaded revolver at said Grace Robinett, or any other occupants there-

of, and thereupon the said Charley Harris, in defense of said Grace Robinett, or any of the other parties at said place, made resistance to said defendant, then the defendant cannot claim to have acted in lawful self defense.''

These instructions, when read in the light of all other instructions, are not open to the criticism urged by the defendant. If they were not as explicit as desired, it was the privilege of the defendant to request more definite and explicit instruction on the points complained of, and in the absence of such request, the defendant cannot now be heard to complain. State v. Lynch, 195 Iowa 560, 192 N. W. 423; State v. Kneeskern, 203 Iowa 929, at page 951, 210 N. W. 465. We have carefully considered the instructions of the court in connection with the complaints urged against these specific instructions and are abidingly satisfied that the court covered all the elements of the case, and that the instructions given are correct, and the court, in the absence of a special request by the defendant so to do, was not required to instruct the jury on any particular theory of the defense. State v. Kendall, 200 Iowa 483, at page 487, 203 N. W. 806.

■■■ The defendant also argues that the court erred in excluding certain testimony concerning an uncommunicated threat made some three months prior to the shooting of Harris. It is claimed that this evidence was admissible for the purpose of aiding the jury in determining who was the aggressor. The witness, Fred Brewer, who was a son-in-law of the defendant, was asked this question.

''Q. Now have you had any conversation with Charlie Harris with reference to your father-in-law? A. Yes, sir.

''Q. You may state to the court and jury whether or not in the conversation Charlie Harris directed any threats toward this defendant, George Matheson.''

This was objected to as incompetent, irrelevant and immaterial, and as too remote from the happening of the accident. This objection was sustained, and then the defendant made the following offer:

''The defendant at this time offers to show by the testimony of Fred Brewer, that during September, 1932, the deceased asked this witness to assist him in assaulting the defendant at night for the purpose of robbing him, and that at that time when he

refused, that said Charlie Harris said he would get the defendant at sometime later, if he did not get him now. The witness will further testify that these matters were not communicated by him to the defendant.''

This was objected to for the same reason offered to the original question, and for the further reason that it was hearsay and too indefinite as to time and place and too remote from the happening of the accident, and no proper foundation was laid to show communication of any such threat to the defendant. This objection was sustained by the court. There is no suggestion in this question or offer of any hatred or ill will against the defendant. The purpose of the alleged attack was that of robbery, and does not fall within the rule of the cases relied upon by the defendant. Furthermore, under the record in this case, there is little room for debate on the question of who was the aggressor. It is strange, indeed that Harris would ask the defendant's son-in-law to assist him in this alleged enterprise of robbing his own father-in-law.

There was evidence to warrant the jury in finding that the defendant, armed with a revolver, a deadly weapon, went to the home of Grace Robinett, where the deceased was peacefully preparing to partake of his evening meal, and shot the deceased down in cold blood, almost in his tracks. The evidence is that he had already pointed a gun at Grace Robinett and pulled the trigger, which constituted a deadly assault upon Grace Robinett, and it is elementary that Charley Harris had the right to interfere in defense, not only of his own person, but of the person of Grace Robinett, and the killing of Charley Harris under such circumstances cannot be excused on the theory of self-defense. We find no error in the record, and the case must be affirmed.

There was submitted with the case motion to dismiss the appeal or affirm judgment. The result we have reached on the merits of the case makes it unnecessary to pass upon the matters presented by said motion, and the same is therefore overruled.— Affirmed.

ANDERSON, C. J., and ALBERT, MITCHELL, KINTZINGER, and POWERS, JJ., concur.