STATE OF IOWA, Appellee, v. MARION ALLEN POWELL, Appellant.

No. 46794.

1228

NOVEMBER 12, 1946.

C. I. McNutt and B. J. Connolly, both of Des Moines, for appellant.

John M. Rankin, Attorney General, Charles H. Scholz, Assistant Attorney General, Leon N. Miller, County Attorney, and N. D. Shinn, Special Counsel, of Knoxville, for appellee.

MULRONEY, J.—During the early evening of April 28, 1945, Mike Slykhuis was mortally wounded by the pistol fire of his stepfather-in-law, Marion Powell. He died the next day and Powell was indicted and tried for murder. He was convicted of murder in the first degree and sentenced to life imprisonment. In his appeal he challenges the sufficiency of the evidence to sustain the verdict, so we will first examine that evidence to see if it supports the verdict.

Mike Slykhuis was about thirty years old. He and his wife,

Sylvia, lived on a farm near Knoxville, Iowa. Sometime before April 28, 1945, Sylvia wrote to her mother, Mrs. Powell, in Des Moines, inviting her and her stepfather down for a weekend visit at the farm. They arrived about 3 o'clock on the afternoon of April 28th and Mr. Powell sat around the house, playing with the Slykhuis children, until Mike came in from the field about 5 o'clock. Mike and Mr. Powell visited for awhile over a glass or two of wine and the conversation turned to coon dogs. Both men were coon hunters and Mike told Powell of some coon dogs in town that he might like. After about half an hour they drove to Knoxville, where Powell purchased a coon dog, and while in Knoxville they went to a pool hall, where Powell purchased a glass of beer for himself and a bottle of coke or pop for Mike. They also purchased some meat and then went to the liquor store, where Powell purchased some wine and a fifth of whisky and Mike purchased a bottle of some peppermint-flavored liquor. While in the liquor store some of the customers noticed that Powell had a gun strapped on his belt and one of the clerks asked him about the gun and Powell said he used it for coon hunting and to train dogs. They arrived back at the farm about 7 o'clock but before they went into the house they saw a car drive into the driveway and Mike noticed it was his uncle, Ike Slykhuis. There was some conversation with Ike concerning a cattle trade and the men walked to where the cattle were to look them over and they finally arrived back at the place where the two cars were parked. They visited while standing beside Powell's car, which was parked about fifty feet from the house, and Powell suggested they get in the car and sit down. They got in the car, a two-door Plymouth sedan, with Powell under the steering wheel and Ike in the right front seat and Mike in the back seat. Soon the liquor was opened and the wine and the peppermint-flavored liquor were passed back and forth among the men. They sat in the car about an hour and Ike made some remark about his sexual relations with a former wife of Powell's and also some remark about his sexual relations with Powell's present wife. An altercation ensued and Powell got out of the car on the left-hand side and Ike got out on the right side and ran around the rear of the car to where Powell was standing and Mike got out on the right side and passed around the front of the car. Powell drew his gun and fired, first

at Ike as he came around from the rear of the car and then at Mike as he came around from the front of the car. Both men were fatally wounded, Ike dying that evening and Mike the next noon.

Sylvia testified that she went to the car while the men were sitting in it to call her husband and stepfather to come to supper and that her mother went out to talk to them. Just before the shooting she heard loud voices coming from the car and she and her mother started out again but she ran back to get a flashlight. She stated she heard the first shot about the time she picked up the flashlight, which was on the dining-room buffet, and the second shot about when she reached the kitchen door. When she got outside, she found her husband lying "about one half or one fourth of the way to the house." He was unconscious. Ike was lying on the ground beside the car, groaning and saying he was shot. Powell was standing near a little chicken house. She ran to a neighbor, screaming for help, and then returned, and in a moment or two Mike recovered consciousness, and she testified:

"* * * he begged me to go get his gun. I asked Mr. Powell why he always had the gun for, and he said he had it for his own protection. Mother went over to Mr. Powell to take the gun from him and he says here, take it, and mother took it. Mr. Powell didn't say anything about the gun. When Mike started begging me to go get him his gun Mr. Powell asked mother to get his gun for him. Mother gave Mr. Powell's gun to him, and Powell didn't say anything. Then Mr. Powell put his gun away and Mike started talking. Mr. Powell was standing by the chicken house nearly all the time. Mike said he certainly would like to have some of that steak. I told him he couldn't leave me because I couldn't get along without him. He told me to take care of the children. Mr. Powell was standing beside the chicken house.

. "Very soon Mr. Powell walked over to Mike and started talking to him. He says well, Mike, I am sorry. I love you. Mike told him he didn't love him or he wouldn't be such a dirty coward. Mike told him what Uncle Ike heard. He said he was talking to Mr. Powell. Mike told Mr. Powell to leave him alone, and Mr. Powell walked away from him. * * *

"I was present when the sheriff put the handcuffs on Powell. Powell said he had no gun. Then I showed the sheriff where the gun was and my mother went over and got it for the sheriff. They got it from the little chicken house. They took Mr. Powell away when the doctor was working on my husband outside of the house. * * *

"The gun Mr. Powell had is a gun that he always had with him. My husband, Mike, had one exactly like it. They both used the guns for .coon hunting and target practice. I heard no trouble between Ike or Mike and Mr. Powell prior to the time I heard the loud voices."

The neighbor summoned by Sylvia's screams telephoned the doctor, and the doctor, the sheriff, and the deputy sheriff arrived about 9:30. Powell was taken to the sheriff's office and Mike was taken to the hospital in an ambulance. Ike was then dead. The doctor rode in the ambulance with Mike and he was interrogated as to Mike's statements on this trip as follows:

"Q. Did the patient Mike Slykhuis say anything to you at that time about going to die? A. Yes, sir, yes, sir. Q. What did he say, doctor? A. He said he was going to die. Q. Was that or was that not on the way into Knoxville? A. That was on the way to Knoxville, yes sir. Q. Did he talk any more on the way into town at that time? A. Yes. Q. What did he say, if you recall what he said, or the substance thereof? Mr. McNutt: Objected to as calling for hearsay, and without proper foundation. The Court: I can't tell yet whether it is or not. I think proper foundation has been laid. To which the defendant excepts. Mr. McNutt: The question was, Your Honor, what did he say, as I understood it. Q. I will withdraw the question. I will ask you this, doctor, if the patient Mike Slykhuis, after he said he was going to die, did he say anything to you that evening about what took place or happened out at the Mike Slykhuis home? A. He did. Q. What did he say? Mr. McNutt: The same objection as last. The Court: Overruled. Exception. A. He said it was all uncalled for. Q. Did he say it was all uncalled for coming in in the ambulance, or was that out there or at the hospital? A. That was coming in the ambulance. Q. In the ambulance? A. Yes, sir. Q. Was there anything else said

as to what happened out there other than what you have already testified to? A. He said he didn't understand why he shot him. Mr. McNutt : Just a moment. The same objection as last urged. The Court: Overruled. Exception. Q. And that last quotation that he said was said after he told you he was going to die, is that right? A. Yes, sir. Q. What else did he say, if anything? A. Well, he told me to take care of his family, do the best I could for them.''

At the conclusion of the doctor's cross-examination defense counsel moved to strike his testimony as to his conversation with Mike on the ground that Mike's statements were not statements of fact but conclusion and the testimony was incompetent, irrelevant, and immaterial.

Much of the State's testimony consists of statements made by Powell in the sheriff's office that night, when he was interrogated by the county attorney in the presence of the sheriff of Marion county and the chief of police and city marshal of Knoxville. The officers testified the county attorney advised Powell of his rights and told him that he did not need to answer any questions and warned him that anything he said might be used against him and advised him that he had a right to an attorney, and, as the chief of police testified: ''Mr. Powell told Mr. Miller [the county attorney] that he would answer the questions if he could.'' The officers testified that when questioned in the sheriff's office Powell stated Mike had whispered to him when they were all sitting in the car, ''let's get Uncle Ike drunk,'' but that he did not want to do that. The officers testified Powell also stated that everything was friendly up until Ike made the remarks about his sexual intercourse with Powell's first wife and present wife. And Powell stated these remarks were followed by Ike's ''cussing'' him and telling him he could whip him. The officers testified Powell stated he then got out of the car and stood there, as ''he didn't want to argue with Ike''; that he backed away from the car and that Ike and Mike got out on the right-hand side of the car and he told them to stop and when they did not stop he shot Ike as he came around from the rear and Mike as he came around from the front; that he did not see anything in Ike's hand and saw nothing in Mike's hand; that the shots were

only a few seconds apart; that Ike and Mike were each about six feet from him when he shot; that he shot in self-defense for both men were coming at him "like they wanted to fight or whip him." The officers testified that Powell did not say anything about any threats or in fact any statements made by Mike Slykhuis.

The defense testimony was given by Mr. and Mrs. Powell and several Des Moines character witnesses. Mrs. Powell testified:

"A. Well, I heard them talking loud out there again and I went out there and Mr. Powell was out of the car then and he says I don't want to hear no more about that, and Ike got out of the car and Mike got out of the car and they came around the car in separate directions, Ike in back and Mike around the front. Q. By that time how close were you to them? A. I was maybe about four feet from them. Q. What was Mr. Powell doing? A. He was backing. He says I don't want to hear no more about it, and he says—he backed away from the car and he just stood there and Ike came running around and he says I will knock your damn head off, and he says I will kill you and he had his right arm up like that. I couldn't see whether he had anything in his hand of course but I did hear afterwards that— I did hear something like it hit the car. Q. Did you hear Mike say anything? A. Yes. Q. What did you hear Mike say? A. Mike says I can whip you on less ground than you can stand on. I will take that gun away from you and kill you. Q. Did you hear any shots? A. Yes. I heard two. Q. Prior to the first shot, did you hear Mr. Powell shout anything? A. He says stop, I tell you, for God's sake stop, and they kept right on coming. Ike says I will kill you. Q. Then where were you when you heard the first shot? A. I was just a little ways from Powell, from them. Q. After that did you hear another shot? A. Yes. Q. How soon after that? A. Just like that, just like that, that's all there was to it (snapping fingers). Q. Then what did you see? A. I seen first Ike fall, then Mike fall. Q. Did you say anything to Mr. Powell, or Mr. Powell say anything to you? A. All I says, Honey, what's the trouble? Well, he says, I was just protecting myself. Mike and Ike was going to kill me. Q. What did you do then, Mrs. Powell? A. Powell handed me his gun and I took hold

of his arm and led him over to this little brooder house and he was shaking like a leaf. * * *

"When Powell shot Ike I was standing close to the car, and Ike came around the car. Powell was partly facing the car. He shot Ike, and Mike wasn't towards the house, he was out toward the brooder house and not far away from the car. Mike was about two or three steps from the car when he was shot, or perhaps four or five. I would testify that Mike said to Powell that I can whip you on less ground than you can stand on, I will take that gun away from you and kill you. Mike did say that."

The defendant Powell testified that he had a permit to carry a gun and that it was his custom to bring a gun with him when he went to the country; that he used the pistol when night hunting. Powell testified concerning the statements made while the three men visited in the car as they passed the liquor around. He stated:

"Finally Ike brought up the subject that he used to any time he wanted to have a good time he went to my place. He had been there many a time, that was some thirty-five or better years ago, in Des Moines; that my first wife was a real friend of his, and he said that was before I ever knew you, Powell. I said well, I don't know anything about that at all. He had discussed that in my presence once before and I told him that I didn't know anything about it. Therefore, I didn't feel it was any fault of mine at all, but that wife and I were divorced and she was dead now, and he brought that up that night again out there. Q. Was he becoming intoxicated then? Mr. Miller: Object to that as calling for the opinion and conclusion of the witness, and leading and suggestive. The Court: Overruled. Exception. A. I would say that he was, yes. * * * Q. Then what was said to you? A. I said well, I don't care about that, that doesn't interest me, and I would rather not talk about it, and he said, why hell, he said, I have been with your first wife and I have been with your present wife and I don't know what you are going to do about it. I said well, I don't think that is any fault of mine. It is more or less between you and them, but I don't like to listen to it. Q. Did he say anything further along those lines? A. He said you will have to listen to it, there is no way

1236

you can get out of it. Q. By that time had Mike taken any part in the conversation? A. Well, Mike said something about a former wife of mine. Q. What did he say? A. He said he knowed she wasn't what she should be, and I said that is the reason that I didn't have her. Q. And now, after Ike had said this about your present wife, what did you say to him? A. He had been with my first wife and my present wife, and he didn't know that there was anything I could do about it. Q. What kind of action did you make? A. I said I don't care to do anything about it. I just don't want to hear about that. Q. By that time had the talking got rather loud? A. Yes, sir. Q. Angry? A. Yes, sir. Q. Do you recall anything else that Mike said? A. Well, Mike made some remark that he didn't know that I was so much, that he could whip me on less ground than I could stand on.''

Powell then testified that he then got out of the car and as he started to get out he heard Ike say, ''if you don't like our company, you don't have to stay but if you don't like what I have said, I'll beat hell out of you.''

His version of the shooting was that Ike ran around the rear of the car cursing him and threatening to beat him and he told him to stop. He said he could not see whether Ike had anything in his hand as it was too dark and when Ike did not stop he pulled his pistol and fired. Then, with respect to Mike, his testimony is:

''Q. After you had shot, where did you next see Mike? A. I looked and Mike was coming at me from the right. Q. Did Mike say anything to you? A. He said you shot Ike, I'll kill you, damn you. Q. What did you do then? A. I said stop, Mike. Q. Did he stop? A. No, sir. * * * Now, what happened next? A. When he didn't stop, I didn't see anything to do other than what I had done before. I just fired again.''

At another point in his testimony he said Mike was between him and the house at the time he shot him. The State introduced impeaching testimony of the neighbor, Mrs. Murphy, first summoned by Sylvia, who heard Mrs. Powell say that night:

''* * * that when Marion Powell first got out of the car he said you can't say that and get away with it. She was in the

dining room of the Mike Slykhuis home. She also remembers that Bessie Powell said that Powell was out of the car with the gun in his hand, and that the two boys were just getting out of the car and that she hollered, don't shoot, and that she also said that she grabbed Powell's right arm after Ike was shot and Powell reached around her and shot Mike.''

Mrs. Powell remembered talking to Mrs. Murphy that night but denied that she made the statements Mrs. Murphy attributed to her and denied she heard Powell say, as he opened the car door, ''you can't say that and get away with it.'' Her testimony was:

''I was on the porch when the first shot was fired. I had opened the door and heard Powell say I don't want to hear any more of that, and I was out on the edge of the porch when the first shot was fired. That is fifteen or twenty steps away from the car and I ran the rest of the way. I didn't get to Powell before the second shot was fired, and I didn't holler at him before I got there, but I was trying to get to him.''

█ I. We will first consider appellant's claim of error raised in his motion that the evidence does not, as a matter of law, support a verdict of guilty of murder as charged in the indictment. The essential elements of first-degree murder are malice aforethought, deliberation, premeditation, and specific intent to kill. State v. Wilson, 234 Iowa 60, 91, 11 N. W. 2d 737. Since the killing in this case was accomplished by the intentional firing of a pistol at the deceased, malice can be inferred from the use of such weapon unless other circumstances in the evidence rebut the presumption. State v. Decklotts, 19 Iowa 447, 448; State v. Pinkerton, 201 Iowa 940, 208 N. W. 351; State v. Sullivan, 230 Iowa 817, 820, 298 N. W. 884, 886, and cases there cited. In the last-cited case the opinion states:

''* * * when as here one deliberately and wantonly opens fire upon another human being with a deadly weapon and with intent to wound that person, the law holds him to the consequences of such act. If the victim is fatally wounded, the law presumes malice and the intent to kill. Under such a state of facts, a conviction of murder in the first degree is warranted.''

▉ The other elements of premeditation and deliberation are likewise provable by the facts and circumstances surrounding the homicide. We have said premeditation and deliberation need not exist for any particular length of time. State v. Fuller, 125 Iowa 212, 100 N. W. 1114; State v. McPherson, 114 Iowa 492, 87 N. W. 421; State v. Woodmansee, 212 Iowa 596, 233 N. W. 725; State v. Baker, 143 Iowa 224, 229, 230, 121 N. W. 1028, 1030. In the last-cited case we said:

"This court has never held that the trial judge could be required by motion to enter into a critical examination of the evidence, where the proof tended to show homicide by violence, with malice aforethought, for the purpose of determining whether in his opinion the act was deliberate and premeditated. There might perhaps be cases where the circumstances of the homicide were such as that the court could say, as a matter of law, that there was no evidence of deliberation and premeditation, but such cases would be exceptional. Where the defendant has selected a deadly weapon, and with opportunity to deliberate has intentionally used it in a deadly manner, it would not, we think, be proper for the court to take the question of deliberation and premeditation from the jury. That under such circumstances it is proper to submit the question of first degree to the jury, although there is no specific proof of deliberation and premeditation, apart from the proof of the violent infliction of a mortal wound, has been affirmed by this court on several occasions."

Manifestly, under the rules of law illustrated in our holdings above cited, the court was justified in the submission of murder in the first degree unless the State's evidence negativing self-defense was insufficient to carry that issue to the jury.

▉ II. In all prosecutions for homicide, where the accused claims to have acted in self-defense, the burden rests on the State to prove beyond a reasonable doubt that the accused did not act in self-defense. State v. Sedig, 235 Iowa 609, 614, 16 N. W. 2d 247, 250, and cases there cited. In the Sedig case the court, speaking through Justice Garfield, stated:

"There are four recognized elements of self-defense in justification for a homicide: (1) The slayer must not be the ag-

gressor in provoking or continuing the difficulty that results in the killing. (2) As a general rule he must retreat as far as he reasonably and safely can before taking his adversary's life. (3) He must actually and honestly believe he is in imminent danger of death, great bodily harm, or some felony, and that it is necessary to kill in order to save himself therefrom. (4) He must have reasonable grounds for such belief. State v. Johnson, 223 Iowa 962, 967, 274 N. W. 41; 40 C. J. S. 983, 984, section 114; 26 Am. Jur. 241, 242, section 126.''

The question is whether a jury question was presented on the existence of at least some of the elements listed above. If there was, the issue of self-defense is for the jury. In approaching the question of whether or not the State sustained its burden of showing the defendant did not act in self-defense, we point out that it is not our province to decide the weight or credence that is to be given to the testimony or to resolve any conflict therein. The State, as said in State v. Burzette, 208 Iowa 818, 222 N. W. 394, was not required to prove that the killing was not in self-defense by direct evidence. The State has met its burden of proof in this regard if it shows that the killing was done under circumstances wherefrom it does not appear that appellant acted in self-defense. The evidence that demonstrates the accused did not kill in self-defense will be taken as true, and all reasonable inference favorable to the State's theory that he did not kill in self-defense will be drawn from such evidence.

▮ Who was the aggressor as between the appellant and Mike in provoking or continuing the difficulty? There is no evidence that any statement of Mike's started the difficulty. The appellant testified it was Ike's remarks that started the altercation. The appellant and his wife are the only persons who testify as to any remarks of a threatening nature made by Mike. Appellant says that while in the car Mike made some remark about his former wife not amounting to much, to which he replied that was why he did not have her any more; that Mike also said, while in the car, that he "didn't know that I amounted to so much, that he could whip me on less ground than I could stand on"; that outside the car, after he had shot Ike, Mike said: "You shot Ike, I'll kill you, damn you." Mrs.

Powell heard Mike make but one statement and she says he was then outside the car. It was: "I can whip you on less ground than you stand on, I will take that gun away from you and kill you." It might appear from the above that appellant and his wife are not together on their evidence as to when the statement that is attributed to Mike about his ability to whip the appellant was made. If it was made inside the car, Mrs. Powell could not have heard it, for she was not there until Mike was outside, under her own testimony. Then, too, there is the impeaching testimony that Mrs. Powell was heard to say that when Powell first got out of the car he said: "You can't say that and get away with it"; and that she said she grabbed Powell after Ike was shot and Powell "reached around her and shot Mike." The State's witness, Sylvia, testified that Mike was lying half or a fourth of the way to the house when she came out, and Mrs. Powell also testified: "Mike was a little ways up further toward the house" and "Mike fell instantly after he was shot." The appellant testified that he was "afraid of them," and in the sheriff's office he said both men were "coming at him like they wanted to fight or whip him." Immediately after the shooting was over, appellant admitted he said to Mike that he was sorry that this happened because he loved him. In the ambulance Mike told the doctor, after he said he knew he was going to die, that "it was all uncalled for," that he did not understand why he shot him. We think the issue as to who was the aggressor or continued the difficulty as between appellant and Mike was for the jury. The jury was not bound to accept appellant's version of what Mike said and did. They could consider his interest and they could consider Mrs. Powell's testimony in the light of the impeaching testimony. There was certainly evidence which, if taken as true, would reasonably indicate that Mike was not the aggressor in the sense that he started or continued the affray.

Did the appellant retreat? The evidence of appellant is that he got out of the car first. He was on the side nearest the house but he was only one or two steps from the car when he shot these two men. Mike had to go from the rear seat of the car out the right-hand door after pushing the front seat forward, then around the front of the car. Clearly the circumstances make it apparent that the issue of retreat was for the jury.

Did he actually and honestly believe he was in imminent danger of death or great bodily 'injury? Whenever he testified as to his fear he always stated he was afraid of both men. He does not testify he was afraid of Mike after he had shot Ike. He was armed and it is a fair inference that he knew the other men were not. We think it was for the jury to state whether his protestations of fear were actually true.

Did he have reasonable grounds for such belief? This, too, was for the jury. He was fifty-nine years old and somewhat smaller than Mike. Mike was about thirty. He testified he had never had any difficulty with him "prior to that time"; that they had always been friendly. He was armed. Whether his .fear of bodily injury at the hands of Mike was reasonable or not was for the jury.

Under the whole record we believe the trial court was right in overruling the motion; that the conviction finds support in the evidence, which raised a jury issue on the question of murder in the first degree and on the issue of self-defense.

 III. One of the errors asserted here is that the testimony of the doctor as to Mike's statements made in the ambulance were inadmissible. Defendant does not argue that the statements were not made by the declarant with a consciousness of impending death. He contends the statements were not admissible because they were not restricted to the act of killing and the circumstances immediately attending the killing and forming a part of the res gestae but were vague and indefinite expressions and conclusions and opinions of the declarant. The declarations were that "it was all uncalled for"; that "he didn't understand why he shot him."

The authorities are by no means in accord with respect to whether statements in the category of those made by declarant here are statements of opinion or of fact.

In Stewart v. Commonwealth, 235 Ky. 670, 678, 32 S. W. 2d 29, 33, the opinion states that the statement most frequently made is: " 'He shot me for nothing.' " While the court goes on to say that the statement would probably be excluded as an opinion statement under prior decisions of the Kentucky Supreme Court, the court observed that: "In most jurisdictions this is held to be a statement of fact."

In Thomas v. Commonwealth, 183 Va. 501, 508, 32 S. E. 2d 711, 714, the statement, ''He just shot me as I got out of my car. I didn't have a chance,'' was admitted in a case where the accused claimed self-defense.

In State v. Fielding, 135 Iowa 255, 112 N. W. 539, we held admissible a statement of the dying declarant that accused deliberately shot her. And again, in State v. Klute, 160 Iowa 170, 140 N. W. 864, we held the same statement admissible as tending to prove a collective fact involving defendant's guilt.

Since in this state the burden is on the State to negative self-defense, it would seem that a declaration which tended to prove this fact would be admissible if it can fairly be held to be a statement of fact. The distinction between fact and opinion statements sometimes grows thin. VII Wigmore on Evidence, Third Ed., section 1919. Sometimes a statement on the border-line between fact and opinion is a common way of expressing a fact. A statement that the shooting was ''uncalled for'' and that ''he didn't understand why he shot him'' is not an uncommon way for a victim of an assault to express the fact that he was not an aggressor; that he gave his assailant no reason that would justify the assault as self-defense. We think the statements admissible as tending to destroy the claim of self-defense. People v. Brown, 62 Cal. App. 96, 216 P. 411; 40 C. J. S. 1250, 1251, section 287. For many cases discussing the admissibility of statements much like the statements in this case, see annotations in 25 A. L. R. 1370, and 63 A. L. R. 576.

IV. In the eleventh and twelfth instructions to the jury the court stated the law pertaining to self-defense and its application to the facts of this case. The appellant excepted to these instructions in that they fail ''to set out and to tell the jury that if they find that Mike Slykhuis acted in concert with Ike Slykhuis, and that Ike Slykhuis was the aggressor in this matter, and in the affray, and that the said Mike Slykhuis acted in concert with him, then he could be considered the aggressor, because the acts of the individual, acts of each person acting in concert are chargeable to the other or all persons acting in concert.'' Particular exception was taken to a portion of Instruction No. 12 where the court stated that before the killing of Mike

would be justified the jury must find that the defendant had been unlawfully assaulted "or was threatened with an assault by the said Mike Slykhuis." The exception was on the ground that the instruction "does not state to the jury that if they find that Mike Slykhuis was acting in concert with Ike Slykhuis, then they shall consider the threats of Ike Slykhuis the same as if made by Mike Slykhuis."

The argument of appellant on the objections urged can be summarized by this quotation from his brief:

"It is the defendant's position that when Mike Slykhuis, the deceased, was present and heard the conversation of Ike Slykhuis, directed at the defendant, heard the threats made by Ike Slykhuis, and later made threats himself and joined in the assault upon the defendant, he adopted the plan of Ike Slykhuis, and any acts chargeable to the said Ike Slykhuis would be chargeable to the deceased, Mike Slykhuis."

The appellant submitted seven requested instructions but not one of them concerned the concert-of-action theory which appellant now urges as a pertinent theory of his defense. But we will examine the theory to see if it has foundation in fact or law. The record of Mike's participation, appellant argues, starts with Mike's statement in the car when he whispered to appellant something to the effect about getting Ike drunk. This does not show any concert of action between Ike and Mike. It would rather indicate a concert of action between the other two men. Appellant is the only living witness to what transpired while the men were in the car. He did not, on the night he was arrested, mention that Mike participated in the altercation he had with Ike in the car. Both that night and in the trial he made it perfectly clear that the trouble all started over remarks made by Ike. His testimony is that the first threat of physical violence came from Ike. This was made as appellant was getting out of the car when Ike said: "* * * if you don't like what I have said, I'll beat hell out of you," and he then testified that Ike got out of the car and ran around the rear and Mike got out and ran around the front. He was then asked: "Did either one of them say anything when they were coming around the car?" His reply was that Ike cursed him and again threatened to beat

him, but he did not, in reply to this question, state that Mike said anything as he came around the car. Appellant states in his argument that he heard the conversation of Ike and heard the threats made by Ike and *later* made threats himself. Under the record, *later* means after Ike was shot. Mike's only threat of bodily harm, according to appellant, was: "You shot Ike, I'll kill you, damn you." According to appellant's wife, Mike's threat was: "I can whip you on less ground than you stand on, I will take that gun away from you and kill you."

Surely, under this record, the question of self-defense starts with the threatened assault by Mike. Appellant does not testify to anything that Mike said or did that could possibly put him in fear of bodily harm from Mike until after Ike was shot. There was no concert of threat when, under appellant's version, Ike lay dying at the time Mike first threatened to take the gun away from him and kill him.

The evidence here does not clearly show a concert of attack by two assailants such as would demand an instruction, without a request therefor, on the law of self-defense governing such a situation. In 40 C. J. S. 1021, section 136, the rule is stated that:

"Where accused is attacked by two or more persons, or is attacked by one person and others are acting with the assailant or are present and aiding and encouraging him, he has a right to act in self-defense against all and, in a proper case, to kill one or all. However, accused is not justified in killing one of such persons where he does not entertain a belief that he is in danger of serious bodily injury or loss of life at the hands of such person."

An instruction which was requested in Norris v. State, 42 Tex. Crim. Rep. 559, 61 S. W. 493, expressed the thought that defendant would be justified if he acted upon reasonable appearances of danger from either of two brothers shot by him in an argument. The charge was for the second shooting and the court held the requested instruction was rightly refused. See, also, Gordon v. State, 193 Miss. 374, 9 So. 2d 877; O'Hara v. Commonwealth, 164 Ky. 403, 175 S. W. 637; Griffin v. Commonwealth, 204 Ky. 783, 265 S. W. 327.

V. The court gave the following instruction, No. 23:

"Evidence has been received tending to show that during the transaction involved in this case, Ike Slykhuis was shot and killed.

"The defendant is now on trial under the indictment returned in this case only, charging him with the murder of Mike Slykhuis, and for no other offense, and such evidence relative to Ike Slykhuis was received in order to assist you in determining the connection of the defendant with the crime of which he is accused under this indictment, and circumstances under which said crime, if any, was committed, and for no other purpose. The evidence relating to Ike Slykhuis shows a separate and distinct transaction from the one charged in the indictment in this case, and the guilt or innocence of the defendant, so far as the death of Ike Slykhuis is concerned, must not be considered by you except as the facts developed by the proof and bearing thereon show, or tend to show, his guilt or innocence of the crime charged in the indictment in this case."

This instruction is objected to on much the same grounds asserted against the self-defense instructions, Nos. 11 and 12, in that it failed to state the concert-of-action theory. The instruction was cautionary and it was proper under a record of testimony showing a double killing by the appellant. From what we have said, the appellant's version of the affair presented separate threats and separate killings; the joint-attack theory of defense was not requested. It was not error for the court to fail to include that theory in Instruction No. 23. State v. Matheson, 220 Iowa 132, 261 N. W. 787.

VI. In Instruction No. 26, the court instructed the jury with respect to the credibility to be attached to the testimony of an impeached witness. The exception to the instruction was its failure to tell the jury, "that if they find that a portion of said testimony has been successfully impeached, they may disregard that portion of the testimony but may use any other part of said testimony in weighing the evidence and arriving at the verdict." The exception is not good. Impeachment is of a witness, not of his testimony. The proof of prior contradictory statements of a witness is a method by which impeachment of a witness may be established where the statement was "material

to the issue.'' Borough v. Minneapolis & St. L. R. Co., 191 Iowa 1216, 184 N. W. 320. It is not his testimony on the proposition that is included in the testimony of a variant statement by the witness that is impeached. Impeachment by proof of prior contradictory statements is an attack on the credibility of a witness generally.

The evidence of the contradictory statement is admissible as tending to discredit the witness. It is ineffective as affirmative proof of the facts related in the statement. 28 R. C. L. 633, section 219. When instructing on the effect of impeachment the court instructs the jury that if they find the witness willfully testified falsely to some material fact, his testimony may be disregarded except insofar as the same was corroborated by other credible evidence. Iltis v. Gentilly, 234 Iowa 689, 13 N. W. 2d 699, and cases there cited; State v. Weber, 204 Iowa 137, 214 N. W. 531. The court did not commit error in failing to include in Instruction No. 26 the matter urged in appellant's exception thereto.

VII. Appellant requested the court to instruct the jury to the effect that appellant was lawfully carrying a gun under a gun permit. We have held it error for the court to mention in an instruction that a gun allegedly used in self-defense might be unlawfully on the person of defendant in violation of statutes prohibiting the carrying of concealed weapons. See State v. Shannon, 214 Iowa 1093, 1096, 243 N. W. 507, 508, where we stated:

''If the alleged assault made upon the defendant was of such a character as to justify the use of a deadly weapon, it was not material that the defendant was not in the rightful possession thereof. In making a proper resistance or defense to an assault made with the intent to kill or to inflict enormous bodily injury, the person assailed may, within the well established limitations of the law, use a deadly weapon, and it can make no difference that his possession thereof was felonious. This would seem to be necessarily true.''

The determination af appellant's right to use a deadly weapon in defense is not dependent upon his right to carry such

a weapon. There was no error in refusing the requested instruction.

 VIII. Appellant requested an instruction as to the weight and effect that the jury should give to the dying-declaration testimony. The requested instruction asked the court to label dying-declaration testimony as "uncertain evidence, likely to be misunderstood, imperfectly remembered, and incorrectly related." It will be remembered the predicate for the admission of the dying declaration was admitted without objection and there is no conflicting testimony in this regard. The declarant told the doctor he knew he was going to die. In the statement he told the doctor to take care of his family and do the best he could for them. His wife shortly before had told him he could not leave her, that she could not get along without him, but he told her to take care of the children. It was for the court to pass upon the sufficiency of the predicate as a basis for the introduction of what the declarant in that state of mind said. State v. Brooks, 192 Iowa 1107, 186 N. W. 46. We have already held that what was said was germane to the issue of self-defense. We hold no error occurred in the refusal of the requested instruction. As bearing thereon, see Banks v. State, 131 Tex. Crim. Rep. 196, 97 S. W. 2d 219; State v. Schmidt, 73 Iowa 469, 35 N. W. 590.

We do not mean to hold that the trial court need not instruct the jury with respect to dying-declaration testimony in all cases where such testimony has been admitted. The admissibility of such testimony is for the trial court in the first instance as to the sufficiency of the predicate testimony, but in a proper case, where the predicate testimony is objected to or in conflict or the statement itself shows some doubt on whether the conditions exist, such as a declaration beginning with "If I die," etc., it may be that an instruction to the effect that the dying declarations should be considered only if the jury believes the declarant was conscious of impending death would be proper and necessary. Here there was no conflict and appellant does not argue the declarant was not conscious of impending death.

 IX. Appellant complains that his motion for a bill of particulars was only partly sustained and that the notices of additional testimony of witnesses who did not appear before

1248

the grand jury were insufficient and the minutes of testimony of other witnesses who did appear before the grand jury were also insufficient. We have examined these claimed errors and find no merit therein. The indictment merely charged appellant with the unlawful, willful, and felonious murder of Mike Slykhuis. The court granted appellant's application for a bill of particulars to the extent that the State be required to furnish appellant a bill of particulars setting forth the manner, mode, and means under and by which it claims the offense was committed and other data sufficient to inform appellant and to enable appellant to prepare his defense. The ruling was proper for the indictment and minutes did not exclude a murder by lying in wait or a murder committed in the commission of a felony. The State then gave appellant a bill of particulars reciting that it was a premeditated and deliberate murder accomplished by shooting Mike Slykhuis after appellant got out of a car, etc. We see no error in the court's ruling.

 The objections concerning the sufficiency of the notices of additional witnesses and the sufficiency of the minutes of grand-jury witnesses can be considered together. State v. Harding, 204 Iowa 1135, 216 N. W. 642, and cases there cited. Appellant points to the minutes of testimony of Raymond Slykhuis, Sylvia Slykhuis, Mabel Murray, Don Derringer, and John V. Murphy, the neighbor. Raymond did not testify at the trial. Mabel Murray was Mike Slykhuis's mother and Don Derringer his brother-in-law. The extent of their testimony is that they saw Mike after he was shot. His mother saw him at the farm and his brother-in-law saw him Sunday morning at the hospital. Sylvia's testimony is somewhat detailed in the minutes. The minutes of Murphy's testimony is that he was present at the farm shortly after 9:30 and can testify as to observations and statements of various parties. We think the minutes were rather brief and too broad a statement of the subject matter of his testimony, but the objection made at the trial when he was called as a witness was as to his giving any testimony because of the insufficient minutes. Mere brevity of the minutes would not prevent his testifying. State v. Van Vleet, 23 Iowa 27. And his testimony was within the subject

matter of his observations and the statements he heard various parties make.

The notice of additional testimony with respect to an engineer who would testify concerning a plat he had made was sufficient, although it appeared the engineer did not make the plat until after the notice was served. The notice of additional testimony with respect to C. A. Bruce, who was present in the sheriff's office and heard statements of Powell, was about like the minutes of Murphy's testimony and therefore not subject to a similar general objection.

We have, in a long line of cases, held the State is not limited to the minutes or notice in its examination of witnesses. State v. Harding, supra, 204 Iowa 1135, 216 N. W. 642; State v. Thom, 236 Iowa 129, 17 N. W. 2d 96.

X. Appellant claims that testimony that Powell told his wife, as the sheriff was leading him away, to call a negro lawyer injected race prejudice in the case. Both Mr. and Mrs. Murphy testified as to the statement and appellant moved to strike on the ground it was incompetent, irrelevant, and immaterial and "may be highly prejudicial." The court refused to strike the testimony and the argument here is that the ruling was erroneous and it resulted in prejudicial error. There might be some doubt as to the materiality of the testimony but the trial court's refusal to strike immaterial testimony would not be reversible error unless prejudice resulted. Counsel for appellant argues prejudice resulted because the statement showed it was a negro lawyer that appellant wished his wife to summon. He points out that the trial was in a rural community almost wholly inhabited by white people, and before a white jury, and he argues that such rural areas "are prejudiced against the negro because of his color," and from this he concludes the testimony showing a white man called a negro lawyer had a "prejudicial effect." We cannot believe, in the absence of some showing in the record, that prejudice resulted from the incidental reference to the color or race of the attorney. We are unwilling to assume the correctness of counsel's premise that the rural area in which this trial was had is prejudiced against negroes. There was no reversible error committed in the refusal to strike the testimony.

Finding no error, the conviction is affirmed.—Affirmed.

GARFIELD, C. J., and OLIVER, HALE, BLISS, WENNERSTRUM, SMITH, and MANTZ, JJ., concur.

HAYS, J., takes no part.